**In re UNITED STATES of America, Petitioner.**

No. 06–1136.

United States Court of Appeals, First Circuit.

Heard Feb. 6, 2006.

Decided March 24, 2006.

---

Kathleen A. Felton, Attorney, Appellate Section, Criminal Division, United States Department of Justice, with whom Alice S. Fisher, Assistant Attorney General, Criminal Division, was on petition for a writ of mandamus and motion to stay district court proceedings, for petitioner.

Howard Srebnick, with whom Black, Srebnick, Kornspan & Stumpf, P.A., Francisco Rebollo Casalduc, Edgar Vega–Pabon, G. Richard Strafer, and G. Richard Strafer, P.A., were on opposition to petition for a writ of mandamus, for respondents Rene Vazquez–Botet and Marcos Morell–Corrada.

Before LYNCH, LIPEZ, and HOWARD, Circuit Judges.

LYNCH, Circuit Judge.

The government petitions for mandamus in this criminal case, seeking, among other relief, an order that the district judge recuse himself on the ground that the judge's impartiality could reasonably be questioned. *See* 28 U.S.C. § 455(a).

On April 8, 2004, a grand jury returned a public indictment charging defendants (and respondents here) Rene Vazquez–Botet and Marcos Morell–Corrada with conspiracy, fraud, and extortion in connection with the bidding process surrounding construction of the "Superaqueduct"—a $305 million public works project in Puerto Rico. Defendants were former officials in the New Progressive Party (NPP): Vazquez–Botet served as campaign manager for former NPP Governor Rossello, while Morell was the Secretary General of the NPP.

Since August 2003, the grand jury proceedings, which took place before three successive grand juries, and the prosecution have been led by attorneys from the Department of Justice's Public Integrity Section, rather than by the local U.S. Attorney's Office, which had previously handled the matter. It was the third grand jury which delivered the April 8, 2004 indictment and the March 3, 2005 superseding indictment (which added one new count against Morell: that he had corruptly influenced the grand jurors and obstructed justice by providing false testimony to the grand jury, in violation of 18 U.S.C. § 1503(a)).[1]

The government's mandamus petition is based on a series of actions taken by the district court in response to allegations of government misconduct as to the grand jury. Defendants have pursued two theories. The first is that government agents violated grand jury secrecy by leaking to

---

1. Another prominent NPP member, the former Vice President of the Puerto Rico House of Representatives, Jose Granados–Navedo, had pled guilty to related charges before the original indictment was returned and agreed to testify for the government against the defendants.

the media protected information from the *second* grand jury. The second is that government agents eavesdropped on confidential conversations by the second grand jury, and that this eavesdropping led the prosecution to engage in "grand jury shopping" when it chose to present the charges for indictment to a third grand jury. The district court (Pérez–Giménez, J.) has conducted an investigation of these allegations over a protracted period of time.

The government has reported to the district court that it has investigated all leaks of grand jury information and found no misconduct by government agents, that it did not engage in eavesdropping, and that its reasons for presenting the indictment to a third grand jury, which it says are not a proper subject for the court to question, were entirely legitimate.

The district court has been unpersuaded. The court has stayed indefinitely the trial date of September 26, 2005, over the government's protest, pending the completion of its ongoing investigation into possible government misconduct as to the second grand jury.

On October 3, 2005, the government asked the judge to remove himself from the case on the basis that his impartiality could reasonably be questioned. *See* 28 U.S.C. § 455(a). It also suggested that the judge was "actually biased against the government and in favor of the defendants." The government's theme was that the judge was "no longer acting as an impartial judicial officer, but instead [had]

taken on the role of an inquisitor/prosecutor by conducting an on-going and secret investigation of the government," such that an objective observer informed of the facts would question his ability to be impartial. The government argued that the court had secretly begun its investigation based on vague and dubiously supported allegations of government misconduct, and had continued its "hunt for misconduct" even when the evidence consistently showed none.

On October 28, 2005, the defendants filed an opposition to the government's motions to recuse and to stop the investigation.

The district judge, in an order dated December 15, 2005, refused to recuse himself or to terminate his investigation; indeed, the judge ordered the government to file even further information going to the theories of wrongdoing alleged by the defense. We describe the order in detail in the next section.

On January 17, 2006, the United States filed in this court a petition for mandamus,[2] seeking an order that the district judge recuse himself; that the case, on remand, be reassigned to a different judge and promptly set for trial; and that the present investigation directed toward it, in the absence of any new evidence, be terminated. This court expedited briefing[3] and argument in this serious case. We now grant the petition for mandamus as to each item of relief sought.

---

2. The decision to file a petition for mandamus is not a local decision, nor even a decision of the Criminal Division of the Department of Justice. It requires the authorization of the Solicitor General of the United States. *See In re United States*, 345 F.3d 450, 453 (7th Cir. 2003).

3. When the trial court refused to reconsider, or to stay its orders to permit the government to seek review in this court, this court stayed

all proceedings in the district court. Further, at the request of this court, the parties and the district court reconsidered whether the many materials which had been filed under seal needed to remain under seal. There was agreement that the majority of the materials could be unsealed; this court ordered that a limited number of documents remain under seal.

## I.

### Description of Orders Staying Trial and Denying Recusal

On December 15, 2005, the district court denied the United States' motion for recusal and for stay of the investigation, saying the motion was untimely and without merit. It said it was investigating "serious and troubling" allegations of government misconduct under its authority under Rule 6 of the Federal Rules of Criminal Procedure and its inherent supervisory authority. The court found that the defendants had made a prima facie showing of violations of Rule 6(d), Fed.R.Crim.P., on five grounds, and of Rule 6(e), Fed.R.Crim.P. This, it said, "trigger[ed] the Court's duty to investigate and demolish[ed] the government's contention that the Court's investigation constitutes a cognizable ground for recusal under 28 U.S.C. § 455(a)." The court ordered further investigation and disclosure from the government.[4]

That opinion and order also explained the court's earlier decision, on August 30, 2005, to delay the trial: while it then had no basis to contemplate dismissal of the indictment, "[i]n extreme cases where defendants can establish prejudice, even dismissal of the indictment may be appropriate." The court thus delayed trial, we infer from its stated reason, because it might conclude after further investigation that the purported misconduct was so egregious as to warrant dismissal of the indictment. The court noted that if the case went to trial and the petit jury found the defendants guilty, the petit jury verdict would render any grand jury rule violation harmless. *See United States v. Mechanik*, 475 U.S. 66, 72–73, 106 S.Ct. 938, 89 L.Ed.2d 50 (1986). From the court's reasoning, we infer that this was a result which could not be allowed to happen, because it would then take away the court's ability to dismiss the indictment.

## II.

### Background

The mandamus proceedings must be evaluated against the history of the investigatory activity against the government by the district court.

### A. Misconduct Theory Involving Leaks of Grand Jury Proceedings (Rule 6(e), Fed.R.Crim.P.)

The court had entirely legitimate concerns about leaks to the media about the second grand jury that sat in this matter. Federal Rule of Criminal Procedure 6(e)(2)(B) provides for grand jury secrecy:

Unless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand jury:

(i) a grand juror;

(ii) an interpreter;

(iii) a court reporter;

---

4. As to potential Rule 6(d) violations, the court announced plans to re-interview members of the second grand jury and directed both sides to submit proposed questions. It ordered the government to file sealed, *ex parte* affidavits from all "government employees tied to the instant case who were or might have been" near the grand jury room while the second grand jury was in session. It ordered that the government provide affidavits from two agents responding to the allegations in two other affidavits which the defense had earlier submitted to the court. And it ordered the government to certify whether a certain FBI agent had been sworn in as an agent of the second grand jury. As to potential Rule 6(c) violations, the court ordered the government to file sealed, *ex parte* affidavits; the court did not specify what the affidavits should be about, only that they were "[i]n the context of potential Rule 6(e) violations" and must come "from each of the government employees, including government attorneys and investigators, authorized to have access to information obtained in any grand jury investigation of the case against" defendants.

(iv) an operator of a recording device;

(v) a person who transcribes recorded testimony;

(vi) an attorney for the government; or

(vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii). Fed.R.Crim.P. 6(e)(2)(B).

It was the government which first raised the possibility that there were Rule 6(e) violations. On August 6, 2003, the U.S. Attorney's office voiced concerns to Judge Pérez–Giménez (in his then-capacity as Acting Chief Judge) about news accounts describing grand jury action in an unrelated public corruption case. The judge, on August 7, appropriately requested that U.S. Attorney García contact the FBI and direct a full investigation. García did so and reported to the court that the matter would be investigated and that the investigation would be expanded to include leaks in this case.

Nonetheless, various media accounts about this case appeared in Puerto Rico newspapers, apparently based on leaks from the second grand jury, as the district court noted in its December 15, 2005 opinion.

The newspaper *El Nuevo Día* published an article on December 8, 2003, based on "sources," purporting to describe the identity, content of testimony, and demeanor of witnesses subpoenaed to testify before the second grand jury. The article identified a "federal source" who stated that the "alleged scheme revolves around Vazquez Botet," who might be charged. On December 9, 2003, Vazquez–Botet asked prosecutor Mary K. Butler, a Trial Attorney in the DOJ's Public Integrity Section, to conduct an inquiry into whether "any-

one in the inner circle of the investigation" had been leaking grand jury information to the media. Butler referred the matter to the DOJ's Inspector General and the DOJ's Office of Professional Responsibility (OPR) in Washington. On March 25, 2004, OPR notified Vazquez–Botet that, after its review of the matter, no further investigation would be initiated.

On April 20, 2004, after the original indictment, an article in *El Nuevo Día*, citing "a source close to the Super Aqueduct investigation," again purported to describe the testimony and demeanor of witnesses before the second grand jury— including Morell. The next day, on April 21, 2004, Vazquez–Botet asked Judge Pérez–Giménez for a protective order barring government agents from leaking grand jury testimony. In response, the government denied being the source or having knowledge of the leaks; it urged Vazquez–Botet to forward any direct information he had about the source of the leak to the OPR or to the FBI. The government stated it was "troubled" and would "refer the matter for investigation." The government noted that on April 19 (a day before the *El Nuevo Día* article appeared), it had circulated a proposed protective order; it asked the court to issue that order. On May 7, 2004, the court, quite appropriately, issued to all parties a strongly worded protective order.[5]

On July 9, 2004, after the original indictment, the *San Juan Star* ran an article, based on "sources," identifying witnesses and describing testimony before the second grand jury. It speculated that the prosecution might soon seek a superseding indictment, and it contained a statement, attributed to a government agent, that

---

5. The order, inter alia, applied to the parties a standing order of the court providing that discovery material consisting of statements of actual or prospective government witnesses before a grand jury must be returned to the government upon the conclusion of trial.

"[t]here are still a lot of things that have to be done" in the investigation.

Also on July 9, 2004, Vazquez–Botet, saying that he had "no doubt" that all the grand jury information had come from the government, requested a court investigation of the leaks. Again, the government responded by denying defendants' "baseless" allegations and noting that much of the published information was "largely inaccurate," but indicating it would again refer the issue to the OPR investigators. The OPR informed defendants on September 29, 2004 that, after review, it would not initiate any further investigation.

The district court did not take up the defendants' invitation to initiate its own investigation of leaks at this point. Indeed, the defendants do not claim that there were any further leaks about grand jury information after July 2004. In short, as of the summer of 2004—after the initial indictment—the issue of whether government agents had violated Rule 6(e) grand jury secrecy rules by way of media leaks was essentially dead.

The issue of leaks was resurrected more than a year later by the defense in opposition to the government's motion for recusal. The district court, in its December 15, 2005 order denying recusal, followed the defense's lead and invoked the articles as a justification for its ongoing investigation into purported government violations of Rule 6(d) and, for the first time, opening an investigation into media leaks that had long since ceased.

B. *Misconduct Theory Involving Eavesdropping/"Grand Jury Shopping Charge" (Rule 6(d), Fed.R.Crim.P.)*

What actually started the phase of the investigation that has given rise to this mandamus petition was an anonymous post-indictment letter, purporting to be from a grand juror on the second grand jury, forwarded by defense counsel to the court on June 1, 2004. Before describing the letter, we set it in context, by describing the rules about grand jury operations at issue and the operation of the sequential grand juries here.

Defendants' theory is that the government eavesdropped on the deliberations of the second grand jury, in violation of Rule 6(d), and that the prosecution withdrew the case from the second panel after learning from the eavesdropping that an indictment was unlikely to be returned, and instead submitted it to the third grand jury, which ended up indicting the defendants.

Defendants alleged this eavesdropping violated Rule 6(d), which governs who may be present:

(1) While the Grand Jury Is in Session. The following persons may be present while the grand jury is in session: attorneys for the government, the witness being questioned, interpreters when needed, and a court reporter or an operator of a recording device.

(2) During Deliberations and Voting. No person other than the jurors, and any interpreter needed to assist a hearing-impaired or speech-impaired juror, may be present while the grand jury is deliberating or voting.

Fed.R.Crim.P. 6(d).

We describe the sequential grand juries here. Regular grand juries generally sit only for specified terms, capped at eighteen months unless the term is extended—and even then, the court may grant an extension for no more than six months.[6]

---

6. There are some exceptions not applicable here. For instance, the term of a special grand jury, as distinct from a regular grand jury constituted under Rule 6, may be extend-

*See* Fed.R.Crim.P. 6(g). In large cases such as this one, involving an alleged public corruption conspiracy lasting over a five-year period, it is not unusual to have several grand juries investigate.

Grand Jury 00–3, which originally investigated this case, was impaneled in 2000 and discharged in 2002. The next panel, Grand Jury 02–1, started in February 2002 and was extended for six months in August 2003. The last time it heard evidence was on January 30, 2004. Grand Jury 02–1 was discharged near the end of February 2004, in the normal course, without being asked to vote on an indictment in this case. Starting in March 2004, the government presented evidence to Grand Jury 03–1, which had been impaneled in March 2003. That grand jury returned the indictment on April 8, 2004, and the later superseding indictment.

On June 1, 2004, in an *ex parte* filing, counsel for Vazquez–Botet submitted an anonymous letter he said he had received from someone claiming to have been a member of the second grand jury, Grand Jury 02–1, and making this accusation:

> I ... worked in the "Supertubo" case; however, Assistant U.S. Attorney Mary K. Butler took the case away from us on February 24, 2004 upon learning that the vast majority of the grand jury had decided on a "NO TRUE BILL." How did AUSA Butler find out [about] our

decision? Our theory ... [is] that in the area where Grand Jury members have coffee they had a microphone and listened in on our conversations, and I'll explain: while we were in the room and had reached our decision, not even ten minutes had gone by before they called and advised us that our grand jury duty service was over....

> ... [O]ne of the reasons why there was no cause for a "TRUE BILL" is that [prosecutors Guillermo Gil Bonar and Butler] did selective prosecutions in order to indict only members of the [NPP]....

The letter went on to attack the U.S. Attorney as biased and to describe specific pieces of testimony before the grand jury in this and other cases.

Neither Vazquez–Botet [7] nor the court informed the government of the request for an investigation. The district court took no action on the letter for over five months, and then, for reasons not stated at the time, initiated an unusual investigation. The government did not learn about the anonymous letter and its accusations, or the investigation, until a status conference held on March 14, 2005.

On November 9, 2004, without notifying the parties and without any simultaneous explanation of why the anonymous letter presented a plausible Rule 6(d) or (e) viola-

---

ed by court order for up to thirty-six months, *see* 18 U.S.C. § 3331(a), and even longer in certain circumstances, *see id.* § 3333(e). Congress can also act to extend the term of a specific grand jury. *See United States v. Mitchell,* 397 F.Supp. 166, 170 (D.D.C.1974) (holding that Congress' statutory extension of grand jury's term was lawful and did not warrant dismissal of indictment), *aff'd sub nom. United States v. Haldeman,* 559 F.2d 31, 140 (D.C.Cir.1976) (en banc).

7. Vazquez–Botet filed the anonymous letter *ex parte,* seeking initiation of an investigation, and the government had no chance to re-

spond. Unfortunately, counsel did not alert the court to authority, such as *United States v. Thompson,* 251 U.S. 407, 413, 40 S.Ct. 289, 64 L.Ed. 333 (1920), contrary to his position. We need not decide whether counsel was obligated to do so. The effect of the omission, though, may have been to mislead the district court. *See In re United States,* 398 F.3d 615, 619 (7th Cir.2005) (per curiam) ("When making *ex parte* applications a litigant must alert the tribunal to authority, known to it, that may be inconsistent with its legal position, for there is no adversary to do that job.").

tion, the district judge directed a magistrate judge to interview "the members of the grand jury whose deliberations were purportedly obstructed," as alleged in the letter. The court did not explain why presenting the third grand jury with the indictment amounted to an obstruction of grand jury deliberations. Nor did it direct the inquiry to a possible violation of secrecy obligations by the purported grand juror.

As ordered, the magistrate judge interviewed each of the grand jurors of the second grand jury separately—asking general questions such as whether they were aware of any "irregularities" and whether any government personnel had "impeded" their duties—and then submitted a sealed report dated January 28, 2005.

The reported results were unremarkable and certainly did not establish any reasonable suspicion of government misconduct. Several jurors expressed surprise that they had not voted on the Superaqueduct case on their last day, but they also mentioned the government's explanations that the government had to examine some documents and that new evidence needed to be investigated. Some expressed surprise that Grand Jury 03–1 was able to return an indictment in such a short time. And several spoke of having been cautioned— usually by the government attorneys—not to discuss the case in the break area, and to keep their voices down in the kitchenette, because they could be overheard by persons in the adjacent waiting room. Some said that the grand jury did not discuss the case outside the grand jury room, although one stated that the grand jurors discussed issues during the lunch time. No grand juror stated that the panel had ever deliberated and reached a deci-

sion in the instant case, contradicting the anonymous letter's assertion that "the vast majority of the grand jury had decided on a 'NO TRUE BILL.' " The magistrate judge concluded that the jurors' accounts were "alone inconclusive in relation to possible irregularities."

Neither side was made aware at that time of the investigation conducted by the magistrate judge or of the results. In our view, whether or not it was appropriate for the district judge to have ever ordered the magistrate judge to conduct an inquiry into eavesdropping, the results of the inquiry were such that the matter should have ended there.[8]

Meanwhile, the defense made two rounds of motions to compel the production of what it called "ministerial" grand jury records from all three grand juries. In the first round, initiated on June 1, 2004 (the same day Vazquez–Botet submitted the anonymous letter to the district court), the defense explained only that it needed the information to verify compliance with grand jury rules. The government, still unaware of the eavesdropping allegations, urged that the secrecy of the grand jury proceedings be maintained, and that information from any non-indicting grand jury was irrelevant. On November 9, 2004 (the same day as its separate sealed order initiating the magistrate judge's investigation), the district court largely granted the defense motion, even as to the first two, non-indicting, grand juries. The court found that the defense had made out a particularized need for disclosure, although it did not specify what that particularized need was. The court declined the prosecution's request that it first conduct an *in camera* review to see if there was a basis for an

8. Indeed, the magistrate judge's questioning of the grand jurors was not well suited to uncovering eavesdropping, because the grand jurors likely would have been unaware of any actual eavesdropping.

inquiry into improprieties. The defense (and eventually the government) received the requested information under seal.

The defense, on January 3, 2005, made another request for additional "ministerial" information from the grand juries. In various filings in this round of requests, the defense expressed to the government for the first time its theory of grand-jury shopping: that the defendants were prejudiced by the "switch" from the second to the third grand jury because the government was able to use the second as a "focus group" to hone its presentation to the third grand jury; and that the third grand jury may have been tainted by the media reports about the second grand jury.

We observe that those claims of prejudice neither make sense nor are they recognized by the law. The first, "focus group" notion, to the extent that it occurs, is an inevitable consequence of multiple grand juries. As to the "taint" from alleged media leaks, the government is free to transfer evidence from one grand jury to a later one. *See* Fed.R.Crim.P. 6(e)(3)(C). The prosecution had no incentive to use the media to leak information to the third grand jury from the second. Under the law, the government could present the third grand jury with the exact evidence presented to the second grand jury.

The government, which remained unaware of the anonymous letter, took two tacks in response to the second round of defense requests for grand jury records. First, it argued that the defense requests,

particularly as to "grand jury shopping," were absolutely an improper subject of inquiry. Second, it nevertheless said it would explain why and how it chose to present the matter to a third grand jury, and did so via two sealed, *ex parte* affidavits to the court. The defendants were thus aware that the government had provided explanations to the court.

Still unsatisfied, the district court on February 3, 2005 ordered the disclosure of further grand jury records, adopting the same reasoning as it had articulated in the November 9, 2004 opinion and order: that the defendants had shown a particularized need, without explaining what that need was.

At a March 14, 2005 status conference, the district court made several rulings which ultimately led to the government's recusal motion. The court for the first time informed the government of the magistrate judge's secret investigation of the second grand jury and the anonymous letter which prompted it; it made the magistrate judge's January 28, 2005 report and the anonymous letter available; and it ordered an acoustical analysis of the grand jury area (as Vazquez–Botet had previously requested).[9] The court also vacated all motions deadlines.

Defendants continued to press the theory of eavesdropping and grand jury shopping with a separate set of factual contentions. In August and December 2005, defendants submitted affidavits from two defense attorneys, both former

---

9. The acoustical report, which the expert submitted on June 29, 2005 and which was made available to the parties on August 2, 2005, examined sound transmission between the grand jury room, an adjoining "waiting room" and "kitchen," and an adjacent "witness waiting room." No microphone was found. The report concluded that "[c]onfidential privacy is not maintained, particularly

in situations with raised or loud voices in any of the rooms." This accords with the magistrate judge's report that the prosecution had specifically warned the grand jury of the problems and urged the grand jurors to keep their voices down in the adjacent rooms. We were informed at oral argument that remedial actions have been taken in response to these acoustical problems.

Assistant U.S. Attorneys, in support of the suggestion that FBI agents had loitered in locations near the grand jury room in order to eavesdrop.[10] We note a few points. The affidavits placed the agents in these locations in April and August 2005, more than a year after the initial indictment here was returned. That provides no reasonable basis for an inference that the agents were improperly in the grand jury area or were eavesdropping at any time relevant to this case. The affidavits also established that defense lawyers, as well as prosecutors, were aware of the acoustical problems with the rooms of the grand jury area.

## III.

### Mandamus

We have jurisdiction to consider the petition. We review all issues of law de novo. *In re United States*, 426 F.3d 1, 4 (1st Cir.2005).

■■■ Subject to some exceptions, an applicant for the writ normally "must show both that there is a clear entitlement to the relief requested, and that irreparable harm will likely occur if the writ is withheld." *In re United States*, 158 F.3d 26, 30 (1st Cir.1998) (internal quotation marks omitted) (quoting *In re Cargill, Inc.*, 66 F.3d 1256, 1260 (1st Cir.1995)); *accord, e.g., In re Martinez–Catala*, 129 F.3d 213, 221 (1st Cir.1997). The irreparable harm standard is viewed in light of the fact that once the case does get to trial "the government has no ready way to appeal if there

is an acquittal and no standing to appeal if there is a conviction." *In re United States*, 426 F.3d at 5.

The government seeks three forms of relief: that the district court be ordered to stop its investigation into potential prosecutorial misconduct involving the grand jury, that the stay of trial be lifted, and that the district court judge be ordered to recuse himself from further involvement in this case.

■■■ The strict standards for issuance of mandamus are relaxed when the government seeks a judge's recusal in a criminal case, "[b]ecause of the government's inability to press an end-of-case appeal." *In re United States*, 158 F.3d at 31; *see also In re Boston's Children First*, 244 F.3d 164, 167 n. 6 (1st Cir.2001). This court has reviewed such decisions under the abuse of discretion standard, rather than the more exacting standard for mandamus. *See In re United States*, 158 F.3d at 31.

■■■ Furthermore, under the recusal standard, any reasonable doubts about the partiality of the judge ordinarily are to be resolved in favor of recusal. Under 28 U.S.C. § 455(a), a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." While recognizing that the "challenged judge enjoys a margin of discretion," this court has repeatedly held that "doubts ordinarily ought to be resolved in favor of recusal." *In re United States*, 158 F.3d at 30; *see also United States v. Snyder*, 235 F.3d 42, 46 (1st Cir.2000). Under

10. In the July 16, 2005 statement, submitted to the court on August 2, one lawyer stated that on April 20, 2005, he observed FBI Agents Vitousek and Hernandez "exiting a room next to the Grand Jury witness room" while the grand jury was in session and that the agents later reentered that room and again exited after remaining inside more than 30 minutes. The other lawyer's December 5,

2005 statement stated that in August 2005 Agent Vitousek was "inside the break room while testimony was going on inside the grand jury hearing room"; and that he "knew from experience that words spoken inside the grand jury hearing room are audible and intelligible to persons in the break room," even with the intervening door closed.

§ 455(a), this court asks whether an objective, reasonable member of the public, "fully informed of all the relevant facts, would fairly question the trial judge's impartiality." *In re United States,* 158 F.3d at 31 (emphasis omitted).

### IV.

Analysis of the government's requests depends in large part upon our assessment of the allegations of prosecutorial misconduct in the grand jury proceedings and the power of the district court to respond to them. Whether the investigation should be terminated depends on whether there is a sufficient reason to suspect that there were Rule 6 violations by the government; we conclude there is not. The propriety of the stay of trial depends on the validity of the district court's reasoning that it needed to do so. This reasoning, to the extent the court justified the stay on this ground, is based on a legal error; further, as a factual matter a remedy of dismissal has never realistically been available in this case.

A. *The Relationship Between the District Court, the Grand Jury, and the Prosecution*

The grand jury, classically, is meant to be an independent check on the ability of the government to bring criminal charges against individuals. It "serv[es] as a kind of buffer or referee between the Government and the people," *United States v. Williams,* 504 U.S. 36, 47, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992), "protect[ing] . . . citizens against unfounded criminal prosecutions," *United States v. Calandra,* 414 U.S. 338, 343, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). The grand jury also has another role, as an investigatory and accusatory body.

■ The federal grand jury "has not been textually assigned" to any of the three branches of federal government. *Williams,* 504 U.S. at 47, 112 S.Ct. 1735. The institution is not mentioned in the body of the Constitution, but in the Bill of Rights. *Id.*; U.S. Const. amend. V. It is thus a "constitutional fixture in its own right"; it is not an arm of the district court. *Williams,* 504 U.S. at 47, 112 S.Ct. 1735 (internal quotation marks omitted) (quoting *United States v. Chanen,* 549 F.2d 1306, 1312 (9th Cir.1977)). Indeed, "the whole theory of its function is that it belongs to no branch of the institutional Government." *Id.* Thus, the grand jury remains functionally and constitutionally "at arm's length" from the judicial branch. *Id.*; *see also Stern v. U.S. Dist. Court for the Dist. of Mass.,* 214 F.3d 4, 15 (1st Cir.2000).

■ The grand jury does not operate completely without judicial oversight. While a court's ability to define judicially created rules of conduct before the grand jury has been sharply cabined by the Supreme Court, *Williams,* 504 U.S. at 55, 112 S.Ct. 1735, a court may still remedy misconduct which violates "one of those 'few, clear rules which were carefully drafted and approved by [the Supreme] Court and by Congress to ensure the integrity of the grand jury's functions.'" *Id.* at 46, 112 S.Ct. 1735 (quoting *Mechanik,* 475 U.S. at 74, 106 S.Ct. 938 (O'Connor, J., concurring in the judgment)). Rules 6(d) and (e) contain such rules. *Id.* at 46 n. 6, 112 S.Ct. 1735.

■ The inherent supervisory authority over grand juries of a court is well recognized.[11] *See McNabb v. United States,* 318

---

11. *See generally* Beale, *Reconsidering Supervisory Power in Criminal Cases: Constitutional and Statutory Limits on the Authority of the* *Federal Courts,* 84 Colum. L.Rev. 1433 (1984). As Beale notes, unlike this case, "most of the Court's supervisory power deci-

U.S. 332, 340–41, 346–47, 63 S.Ct. 608, 87 L.Ed. 819 (1943). "[I]n the exercise of supervisory powers, federal courts may, *within limits,* formulate procedural rules not specifically required by the Constitution or the Congress." *United States v. Hasting,* 461 U.S. 499, 505, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (emphasis added).

 Unlike in many foreign countries, the federal courts in the American criminal justice system generally do not have the power to act as investigators or prosecutors of misconduct, including misconduct by government prosecutors. *See In re United States,* 345 F.3d 450, 452 (7th Cir. 2003). Rather, such powers are usually exercised by the grand jury and the executive branch. Investigatory and prosecutorial decisions are usually "made outside the supervision of the court." *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 807, 107 S.Ct. 2124, 95 L.Ed.2d 740 (1987).

Here, both Rule 6 and the court's inherent supervisory authority undoubtedly provided some authority to investigate misconduct as to the grand jury proceedings, subject, of course, to the broader constitutional principle of the separation of powers. *See In re Grand Jury Subpoena of Rochon,* 873 F.2d 170, 174 (7th Cir.1989) ("[A]lthough the grand jury is subject to a supervisory power in the courts, aimed at preventing abuses of its processes or authority, the separation-of-powers principle imposes significant limits on it." (internal quotation marks and citation omitted) (quoting *Chanen,* 549 F.2d at 1313; *United States v. Gatto,* 763 F.2d 1040, 1046 (9th Cir.1985))).

This court has been mindful of these separation of powers constraints. It has rejected an attempt to have federal courts use their inherent supervisory authority to disqualify a federal prosecutor who had otherwise been properly appointed by the Executive branch. *See United States v. Silva–Rosa,* 275 F.3d 18, 21–22 (1st Cir. 2001); *see also In re Grand Jury Subpoena of Rochon,* 873 F.2d at 174–76 (holding that the district court violated the separation of powers doctrine when it used its inherent supervisory authority to disqualify the United States Attorney from participating in a grand jury investigation, when there was no conflict of interest violating a "specific constitutional provision, statute, or rule").

 These constraints mean that there must be some reasonable basis for a district court to launch an inquiry into claims that the prosecutor has engaged in grand jury misconduct. Some courts have adopted a rule that a prima facie case must be shown first.[12] We are reluctant to use such a test. The "prima facie case" test is used in many different ways and means many different things. Further, a formulaic approach helps little: the varieties of possible misconduct and the factual variations are myriad. Depending on context, mere suspicion may be enough to cause further inquiry into violation of a well-established rule, particularly where infringement of a defendant's constitutional rights is potentially involved.

In addition to the question of whether investigation is warranted, there are limits on who should investigate and how the investigation should be done. Here the

sions have announced general rules of procedure and evidence for federal criminal proceedings." *Id.* at 1449.

**12.** *See, e.g., United States v. Rioux,* 97 F.3d 648, 662 (2d Cir.1996); *Barry v. United States,* 865 F.2d 1317, 1321 (D.C.Cir.1989); *Blalock v. United States,* 844 F.2d 1546, 1551 (11th Cir.1988); *see also Finn v. Schiller,* 72 F.3d 1182, 1187–91 (4th Cir.1996).

court used both the traditional means, authorized by the rules, of requiring the government to disclose information and the non-traditional means of requiring a magistrate judge to question jurors. The court may also refer matters for investigation by law enforcement officers. If, for example, there is a basis to believe there has been a crime committed, such as obstruction of justice, *see* 18 U.S.C. § 1503, or criminal contempt, outside the court's presence, occasioned by misconduct before the grand jury, then the district court should ordinarily refer the matter to the Department of Justice for prosecution. *See In re United States,* 398 F.3d 615, 618 (7th Cir.2005) (per curiam) ("In the rare situations when a prima facie case of criminal contempt has been made out, and the contempt is not committed in the judge's presence (and thus amenable to summary disposition), the judge *must* turn the matter over to a prosecutor rather than assume an inquisitorial role inappropriate to the Judicial Branch." (emphasis added)); Fed.R.Crim.P. 42(a).

Further, Rule 6(e)'s criminal statutory analogue, 18 U.S.C. § 1508, makes it a crime to knowingly and willfully record (or attempt to record) the proceedings of any grand jury while it is deliberating or voting, and to listen to or observe (or attempt to listen to or observe) the proceedings of any grand jury while it is deliberating or voting. If there were a basis for believing there was a violation of 18 U.S.C. § 1508, the matter could have been referred to a different branch of the Department of Justice for investigation and prosecution. Referral for prosecution has the effect of reducing the involvement of the district judge and thus the risk of presenting the appearance that the court has improperly become an investigator and prosecutor of the parties before it. Here, the district

court chose to conduct its own investigation in private.

There are also limits on what may be investigated. As emphasized in *Williams,* "[b]ecause the grand jury is an institution separate from the courts, *over whose functioning the courts do not preside,* we think it clear that, as a general matter at least, no such 'supervisory' judicial authority exists [to prescribe standards of prosecutorial conduct before the grand jury]." 504 U.S. at 47, 112 S.Ct. 1735 (emphasis added). *Williams* involved a claim of misconduct based on the government's failure to disclose exculpatory evidence to the grand jury. *See id.* at 37–38, 112 S.Ct. 1735. The Court also stated that

> any power federal courts may have to fashion, on their own initiative, rules of grand jury procedure is a very limited one, not remotely comparable to the power they maintain over their own proceedings. It certainly would not permit judicial reshaping of the grand jury institution, substantially altering the traditional relationships between the prosecutor, the constituting court, and the grand jury itself.

*Id.* at 50, 112 S.Ct. 1735 (citation omitted). The district court's investigation of "grand jury shopping" invokes this concern about altering the traditional relationships.

The district court's remedial powers are also limited. Some remedies are explicitly authorized by the Rules. For example, Rule 6 provides that the court may order an exception to grand jury secrecy at the request of a defendant "who shows that a ground may exist to dismiss the indictment because of a matter that occurred before the grand jury." Fed.R.Crim.P. 6(e)(3)(E)(ii).

Rule 6 also provides the court the power to find a violator in contempt for knowing

violations of Rule 6(e) secrecy rules.[13] Fed.R.Crim.P. 6(e)(7). The advantage of contempt as a remedy for misconduct by government agents is that the remedy focuses, as it should, "on the culpable individual rather than granting a windfall to the unprejudiced defendant." *Bank of Nova Scotia v. United States,* 487 U.S. 250, 263, 108 S.Ct. 2369, 101 L.Ed.2d 228 (1988). Dismissal of the indictment poses exactly such a risk of granting a windfall to the unprejudiced defendant, at the expense of the public interest.

 Rule 6 does not itself define when an indictment may be dismissed due to "a matter that occurred before the grand jury." But those circumstances are very rare. "[A]s a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Id.* at 254, 108 S.Ct. 2369. Where a court is asked to dismiss an indictment before the conclusion of trial, the standard of prejudice is a high one: that "dismissal of the indictment is appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict,' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations."

*Id.* at 256, 108 S.Ct. 2369 (quoting *Mechanik,* 475 U.S. at 78, 106 S.Ct. 938 (O'Connor, J., concurring in the judgment)). We wish to be clear that at no point has there been any showing that there was any impropriety that "substantially influenced" the decision of the third grand jury to indict.[14] Indeed, the limit on the court's power to dismiss an indictment is so strong that, once a case goes to trial, a verdict by a petit jury "render[s] harmless any conceivable error in the charging decision" to indict. *Mechanik,* 475 U.S. at 73, 106 S.Ct. 938. When and whether these limits on the court's authority may be invoked is highly dependent on the facts of each situation.

### B. *Investigation into Alleged Violations of Grand Jury Rules*

The district court justified its past and ongoing investigations by making findings that there were adequate showings that Rules 6(d) and (e) had been violated.

#### 1. *Grand Jury Leaks*

 There was no error in the district court's initial actions in response to leaks to the media, namely, asking the U.S. Attorney to have the FBI and DOJ investigate the matter.[15] The protective order

---

**13.** There is a debate, not pertinent here, about whether the contempt power applies to all of Rule 6 or only to violations of Rule 6(e). Rule 6(e)(7) provides broadly that "[a] knowing violation of Rule 6 … may be punished as a contempt of court." As noted in the Advisory Committee Notes to the 2002 Amendments, "the scope of the contempt sanction in Rule 6 is unsettled." The Notes suggest that the contempt provision is "seemingly … misplaced in subdivision (e)," because of "its apparent application to the entirety of the Rule." Fed.R.Crim.P. 6 advisory committee's notes (2002 amendments).

**14.** There is, for example, no claim as in other cases that flagrantly inflammatory and improper comments by the prosecutor were part

of a pattern of conduct that substantially impaired the ability of the grand jury to review the case against the accused impartially and independently. 2 Beale et al., *Grand Jury Law and Practice* § 9:2, at 9–10 (2001).

**15.** Similarly, the district court had authority to keep under seal such portions of its response to motions and its investigation "to the extent and as long as necessary to prevent the unauthorized disclosure of a matter occurring before a grand jury." Fed.R.Crim.P. 6(e)(6); *see also* Fed.R.Crim.P. 6(e)(5) (court "must close any hearing to the extent necessary to prevent disclosure of a matter occurring before a grand jury"); *In re Newark Morning Ledger Co.,* 260 F.3d 217 (3d Cir. 2001).

issued on May 7, 2004, applicable to both sides, was also proper. However, the court's actions in launching an investigation of the government as a source of the pre-indictment leaks, more than a year after the leaks had stopped and after a decision had been made de facto not to investigate leaks further, were unjustified in this context.

▮ The purposes served by the grand jury secrecy rule did not justify the court's actions. These purposes include encouraging prospective witnesses to come forward and testify "fully and frankly" to the grand jury, without improper influence in the form of threats or inducements; preventing targets of grand jury investigation from being alerted to the scrutiny and fleeing, or attempting to influence grand jurors or witnesses; and assuring that those who are investigated but not indicted are saved from "public ridicule." *Douglas Oil Co. v. Petrol Stops Nw.*, 441 U.S. 211, 218–19, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979). The issue is quite different when the grand jury, as here, has returned the indictment. *See id.* at 218–19, 222 (interests served by grand jury secrecy are reduced after indictment); 1 Wright, *Federal Practice and Procedure* § 106, at 365–66 (3d ed.1999). Once the indictment is public, these concerns are largely gone.

We disagree that there was, at the time of the district court's December 15, 2005 justification, a basis for investigating further. The court found that the media

reports established there were leaks; that the articles indicated that the source of the information was someone covered by the secrecy rule, such as "a federal source"; and that the nature of the leaked information indicated that the government was the source. The court said it must assume that all statements in the news reports were correct, rejecting as immaterial the government's point that the articles were inaccurate in part and speculative in part.[16] The court concluded that the "inference of government misconduct" remained unrebutted.

While these factors may have justified the issuance of the May 7, 2004 protective order, they did not thereafter, absent new information, justify the further investigation of *government* misconduct, justified by the district court for the first time on December 15, 2005. The district court as well had apparently concluded there was no basis for further action after the May 7, 2004 protective order, and for good reason. Most importantly, the government had twice referred the matter to independent DOJ officials for investigation, and they had found nothing. Further, the indictment had issued, minimizing any harm. Moreover, there were a number of possible sources, particularly given the acoustical problems with the grand jury room. And not all individuals with knowledge of matters occurring before a grand jury are forbidden from disclosing their knowledge.[17]

---

**16.** "[S]tatement[s] of opinion as to an individual's potential criminal liability" and discussion of "actions taken by government attorneys or officials," such as "a recommendation by the Justice Department attorneys to department officials that an indictment be sought against an individual," do not "reveal any information about matters occurring before the grand jury." *In re Grand Jury Investigation (Lance)*, 610 F.2d 202, 217 (5th Cir. 1980); *see also id.* at 217 n. 5 ("Several of the

articles ... discuss actions taken by the Justice Department," such as when the Department will decide whether to seek an indictment, and "such disclosures do not violate Rule 6(e).").

**17.** Indeed, the rule on grand jury secrecy, Rule 6(e)(2)(A), is express that the court may not impose (and so sanction for noncompliance with) an obligation of secrecy on any person except in accordance with Rule 6(e)(2)(B). Most notably, witnesses who have

### 2. *Eavesdropping and the "Grand Jury Shopping" Theory*

■ We separate the idea of eavesdropping, which could violate both Rule 6(d) and a criminal statute, 18 U.S.C. § 1508, from the idea of grand jury shopping.

By limiting the persons who may be present when the grand jury is in session, Rule 6(d) protects the secrecy of the grand jury and avoids possible undue influence on the grand jury. *Mechanik*, 475 U.S. at 74–75, 106 S.Ct. 938 (O'Connor, J., concurring in the judgment). As to government attorneys, the limits in the Rule apply only when the grand jury is deliberating or voting. Since the second grand jury was never asked to vote on the indictment, it is difficult to see why Rule 6(d)'s purpose of avoiding undue influence is at stake here. Certainly, had there been improper eavesdropping by the government, the proper remedy would have been some sort of sanction against the agents involved. There was, in the end, no evidence to support even the eavesdropping theory.

The district court justified its continuing investigation, even after the magistrate judge's report, by finding sufficient indicia of eavesdropping on the second grand jury based on: first, the anonymous note from the purported member of the second grand jury; second, the statements of a few members of the second grand jury that they were surprised about not being able to vote on whether to indict; third, the acoustical study, which found that "confidential privacy is not maintained" and so "establish[ed] that the government had the opportunity to eavesdrop on the Grand Jury from adjacent rooms"; and fourth and fifth, two affidavits which the defendants had submitted describing the sighting of two FBI agents in the vicinity of the grand jury more than a year after the indictment was returned.

The anonymous letter, which contained only speculation and was of dubious provenance, was itself insufficient to launch a secret magistrate-judge investigation into claimed eavesdropping by the government. After the magistrate judge's investigation, there was no factual basis to proceed further.[18] Since the second grand jury was never asked to indict, these jurors' comments are irrelevant to the criminal trial. The acoustical examination and report showed there was no "hidden microphone," as alleged in the anonymous letter. An opportunity to eavesdrop was, regrettably, given to anyone in the vicinity, including the defense bar. The affidavits supplied by the defense, that government agents had been seen in the vicinity, dealt with events more than a year after the initial indictment.

Much more seriously, there was no basis in the law for the defendants to use their eavesdropping allegation either to question the government's use of a third grand jury or to seek dismissal of the indictment. The district court justified its inquiry into the grand jury shopping theory, in refusing to recuse itself, saying that:

> [t]hough the government is correct in its contention that it was free to submit the case to a second grand jury even if the first was not willing to indict, the argument is nonetheless off the mark in the present context. Although the govern-

---

been called to testify before the grand jury are not covered by Rule 6(e)(2)(B).

**18.** The district court's December 15, 2005 opinion also invokes a local rule, 106(c), as part of its broad "grand jury secrecy" investigation. The rule adds nothing to the analysis. And obviously, the prosecutors and their agents had no need to eavesdrop to ascertain the identity of witnesses or members of the grand jury.

ment is unquestionably endowed with wide discretion in its decision whether to submit a case to a particular grand jury, it is unquestionable that prosecutors are bound by the Federal Rules of Criminal Procedure in their actions. Thus, while the government could have decided not to seek an indictment from Grand Jury 02–1 for any reason, or no reason at all, it could not have reached its decision by means of a Rule 6(d) violation.

This reasoning does not support the court's actions.

■■■ It is doubtful the district court had any basis, on these allegations, to investigate the use of a third grand jury, since Rule 6 gives the government exactly that authority. Further, "federal judges may not insist that prosecutors reveal deliberative or pre-decisional materials," but must instead "review outputs." *In re United States*, 398 F.3d at 618. Rule 6 expressly authorizes the prosecutor's disclosure of matters presented to one grand jury to successive grand juries. *See* Fed. R.Crim.P. 6(e)(3)(C); *United States v. Contenti*, 735 F.2d 628, 631 n. 1 (1st Cir. 1984) (explaining that "[i]t is not in the public's interest to expect each new grand jury to start all over rather than accept the work product of the prior grand jury").

As one commentator has noted, "[t]he longstanding federal rule is that resubmissions [of an indictment after one grand jury refuses to indict] are permissible, without court approval, even when the prosecutor presents no additional evidence to the second grand jury." 4 LaFave et al., *Criminal Procedure* § 15.2(h), at 284–85 (2d ed.1999); *see also Williams*, 504 U.S. at 49, 112 S.Ct. 1735. The reason was stated by the Supreme Court in *United States v. Thompson*, 251 U.S. 407, 40 S.Ct. 289, 64 L.Ed. 333 (1920): "[T]he power and duty of the grand jury to investigate ... is continuous and is therefore not exhausted or limited by adverse action [previously] taken by a grand jury or by its failure to act...." *Id.* at 413, 40 S.Ct. 289; *see also Ex parte United States*, 287 U.S. 241, 250–51, 53 S.Ct. 129, 77 L.Ed. 283 (1932). We see nothing to suggest that Rule 6(d) was meant to cabin this historic power of the prosecution, especially where, as here, the second grand jury did not even reject the indictment—it was not asked to vote.

Since Rule 6 authorizes the prosecution's use of sequential grand juries, the district court's investigation ran the risk of violating the principle of separation of powers by interfering with the constitutional prerogatives of the executive branch and of the grand jury. *See Williams*, 504 U.S. at 48, 112 S.Ct. 1735; *see also United States v. Bolden*, 353 F.3d 870, 877 (10th Cir.2003) ("[The Constitution] vests the Executive with substantial discretion in choosing when and how to prosecute cases."); *In re United States*, 345 F.3d at 452. We need not decide whether there can be some form of impermissible grand jury shopping which would warrant court inquiry. What is dispositive for present purposes is that whether or not the district court ever had any authority to question the government's reasons for submission to a third grand jury, the government provided those reasons to the district court under seal, and the reasons were entirely legitimate and reasonable. The court had no basis to look behind them.

## C. *The Delay of Trial*

■■■ The district court justified its delay of the trial, as we infer from its stated reasons, on the theory that if it did not stay the trial, under *Mechanik*, a conviction after trial by the petit jury would cure any error in the indictment, and that would deprive the court of its power to dismiss the indictment. If this was the intent of the court, it is based on a clear

error of law and the stated premises are backwards. Matters of a court's own disciplinary power, which could be easily handled by other remedies if there were Rule violations, may not be elevated above the public interest in trial of criminal defendants.

 Since none of the irregularities alleged here could have resulted in dismissal of the indictment, as there was no demonstrable prejudice to the defendants, there was no reason to stay the trial. The defendants' only claim of prejudice is that the third grand jury was somehow tainted by leaked information from the second grand jury. It is doubtful that adverse publicity claimed to affect a grand jury states a basis for dismissal.[19] Here, this argument falls flat, since the government can cure any misinformation by re-presenting information from one grand jury to another. Dismissal of the indictment is not appropriate when secrecy violations "could not have affected the charging decision." *Bank of Nova Scotia*, 487 U.S. at 259–60, 108 S.Ct. 2369. There was no viable claim that the charging decision by the third grand jury was "substantially influenced" by any eavesdropping.

Further, the court's apparent reasoning was that, on the basis of alleged grand jury misconduct, it could delay the trial. This ran afoul of the public interest in having the trial of the case promptly commence. The Supreme Court has explicitly discouraged the delay and disruption in criminal proceedings caused by judicial review of claims of prosecutorial misconduct. *See* 2 Beale et al., *Grand Jury Law and Practice* § 9:1, at 9–3 to 9–4 (2001). That

was the theme in *Costello v. United States*, 350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956), reinforced later in *Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561. *Costello* announced the rule that "[a]n indictment returned by a legally constituted and unbiased grand jury, . . . if valid on its face, is enough to call for trial of the charge on the merits." 350 U.S. at 363, 76 S.Ct. 406. The Court noted that the hearing of challenges to the sufficiency of the evidence presented to the grand jury "would result in interminable delay but add nothing to the assurance of a fair trial." *Id.* at 364, 76 S.Ct. 406.

This court, too, has expressed the same concerns about delay. We have invalidated a local rule promulgated by a district court, when the court impermissibly interfered with grand jury secrecy. *Stern*, 214 F.3d 4. In doing so, we noted that one of the vices of the rule was its "potential as an incubator for delay." *Id.* at 16 (citing *United States v. R. Enters., Inc.*, 498 U.S. 292, 111 S.Ct. 722, 112 L.Ed.2d 795 (1991)). Delay of criminal trials imposes costs not only on the government, but on society: "delay may compromise society's 'interest in the prompt administration of justice,' and impede accomplishment of the objectives of deterrence and rehabilitation." *Mechanik*, 475 U.S. at 72, 106 S.Ct. 938 (quoting *Hasting*, 461 U.S. at 509, 103 S.Ct. 1974).

## V.

### Recusal

 We return to the question of whether these events provide a basis for

---

19. One circuit court has held that prejudicial publicity does not provide a basis for dismissing the indictment, saying that the concern over adverse publicity is how it affects the ensuing trial, and not the grand jury proceeding. *United States v. Waldon*, 363 F.3d 1103, 1109 (11th Cir.2004) (per curiam). An earlier decision of this court was similarly hesitant to dismiss an indictment on grounds of allegedly prejudicial publicity. *See United States v. Brien*, 617 F.2d 299, 313 (1st Cir.1980) (noting that "the taint of a grand jury will be purged by the deliberations of an untainted petit jury" and that "there is no contention here of a publicity prejudiced petit jury").

recusal under 28 U.S.C. § 455(a), under the standards described earlier.

## A. *Timeliness*

The district court denied the recusal motion on two grounds: it was too late and it was without merit. *See In re United States,* 158 F.3d at 34 ("the timeliness of the government's recusal motion" is "a proper subject for scrutiny"); *In re United States,* 666 F.2d 690, 694 (1st Cir.1981) (a motion for disqualification under § 455(a) must be timely filed). This court has not stated a standard of review for a holding by a district court that a recusal motion is untimely, but has viewed the issue as a preliminary one and engaged in our own review of whether there was a calculated withholding of a recusal motion such that we would deem it waived. *See In re Abijoe Realty Corp.,* 943 F.2d 121, 126–27 (1st Cir.1991); *In re United States,* 666 F.2d at 694. Under any standard, we reject the preliminary argument that the recusal motion came too late.

 A motion to recuse is a very serious matter and must have a factual foundation; it may take some time to build the foundation. At the same time, courts will reject what appear to be strategic motions to recuse a judge whose rulings have gone against the party. That is why, in general, a party must raise the recusal issue "at the earliest moment after [acquiring] knowledge of the [relevant] facts." *In re Abijoe Realty Corp.,* 943 F.2d at 126 (alterations in original) (internal quotation marks and emphasis omitted) (quoting *United States v. Owens,* 902 F.2d 1154, 1156 (4th Cir. 1990)).

The government's motion was timely. The September 2005 trial date was not postponed indefinitely until August 30, 2005. The government's recusal motion was filed on October 3, 2005, one month later. The motion was filed soon after it

became clear that the court not only was going to continue its investigation, but also was going to delay the trial of the case. The recusal motion here was based on an accumulation of events, and the government did not waive its claim by filing when it did.

## B. *Merits of the Recusal Claim*

### 1. *Claims of Actual Bias*

 Before turning to the heart of the argument for recusal, we first dispose of the government's argument that Judge Pérez–Giménez was actually biased against it. The government argues there were two proofs of actual bias: first, that the judge was predisposed against a key witness in the government's case, FBI Special Agent Ivan Vitousek, and second, that the judge was politically biased against prosecutions of former NPP officials. The government uses two incidents to support its claim of actual bias.

First, in moving for recusal, the government attached an affidavit from FBI Special–Agent–in–Charge (SAC) Fraticelli, which stated that on or about June 19, 2004, while he was in "transition" to the SAC position, he was summoned to a meeting with then-Chief Judge Laffitte and Judge Pérez–Giménez in Judge Laffitte's chambers. Fraticelli reported that Judge Laffitte expressed concern about recent media leaks in *several* high-profile cases, and "[b]oth federal judges stated that ... [Agent] Vitousek was responsible," noting that the leaks were more prevalent in cases for which he was the case agent.

This filing provoked the filing by Vazquez–Botet on December 12, 2005 of an affidavit from Judge Laffitte, as well as Judge Pérez–Giménez' response in the December 15, 2005 order. Judge Laffitte and Judge Pérez–Giménez deny having been so

blunt as to say Agent Vitousek was responsible, and Judge Laffitte says he only pointed out the coincidence that leaks were more prevalent in cases in which Vitousek was case agent. Judge Laffitte did say that before the meeting, Judge Pérez–Giménez informed him that the leak investigation "pointed to ... Vitousek." Judge Pérez–Giménez does not address this point.

When Fraticelli questioned Vitousek, Vitousek denied being the source of any leak, and Fraticelli reported that fact back to Judge Pérez–Giménez in June 2004, as well as the government's position that any leaks did not come from the FBI. No action was taken as to the allegations against Agent Vitousek thereafter. There has never been a *finding* that Agent Vitousek was a source of leaks. Far from proving actual bias, this episode shows responsible actions by two judges legitimately concerned about maintenance of grand jury secrecy in their district.

The government also argues that there is other evidence of a predisposition by the district judge against Agent Vitousek, and indeed, against the government in criminal prosecutions of NPP officials. That evidence, it says, is found in our opinion in *United States v. Rivera Rangel*, 396 F.3d 476 (1st Cir.2005). In *Rivera Rangel*, another political corruption case, the jury returned a verdict of guilty against an NPP official who had been the executive assistant to the governor. The same judge as in this case set aside the verdict and alternatively ruled that the defendant was entitled to a new trial because government agents (including Agent Vitousek) had improperly failed to produce exculpatory evidence. This court held that both actions were in error, reversed, and remanded. *Id.* at 482–86. The court did not, however, base its reversal on any demonstration of actual bias.

Pursuant to our statutory power to reassign "as may be just under the circumstances," 28 U.S.C. § 2106, we also instructed in the mandate that the case, on remand, be reassigned to a different judge. That statutory standard, again, does not depend on there being actual bias. *See, e.g., Conley v. United States*, 323 F.3d 7, 15 (1st Cir.2003) (en banc) (remanding to new judge, despite having "no doubt about the good faith of the district judge," where remanding to original judge would put him "in a very awkward position"); *Mawson v. United States*, 463 F.2d 29, 31 (1st Cir. 1972) (per curiam) (ordering that on remand a new judge be assigned "both for the [original] judge's sake, and the appearance of justice").

Again, we think the prosecution quite overreaches in its contention that the *Rivera Rangel* case somehow establishes actual bias in this case by the district judge.

### 2. *Recusal Under 28 U.S.C. § 455(a)*

■ "The judge does not have to be *subjectively* biased or prejudiced, so long as he *appears* to be so." *Liteky v. United States*, 510 U.S. 540, 553 n. 2, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Subsection (a) of 28 U.S.C. § 455 "requires recusal in some circumstances where subsection (b) does not." *Id.* The recusal statute, by its terms, operates both ways, whether the appearance is of partiality in favor of a defendant or in favor of the government. Partiality in favor of the government may raise a defendant's due process concerns. *See In re Murchison*, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). Just as there is a prohibition against a judge "adjudicating a case where he was also an investigator for the government," *Johnson v. Carroll*, 369 F.3d 253, 260 (3d Cir.2004), there is a prohibition against a judge adjudicating a case where he has become an investigator against the government.

The defendants rely heavily on the principle that a judge's rulings and statements in the course of proceedings before him or her rarely provide a basis for recusal under § 455(a). *See Liteky,* 510 U.S. at 555, 114 S.Ct. 1147. That principle applies even to misjudgments: a judge's erroneous rulings will not ordinarily be enough to warrant a writ of mandamus to the judge to recuse himself or herself.[20] *See In re Boston's Children First,* 244 F.3d at 168 n. 7; *see also Liteky,* 510 U.S. at 556, 114 S.Ct. 1147 ("ordinary admonishments (whether or not legally supportable) to counsel and to witnesses" were inadequate to establish bias or prejudice where they "occurred in the course of judicial proceedings, and neither ... relied upon knowledge acquired outside such proceedings nor ... displayed deep-seated and unequivocal antagonism that would render fair judgment impossible") (emphasis omitted).

Here, though, the government's complaints focus on the delay of trial due to the court's conducting an investigation of the prosecution, which investigation is ancillary to its rulings in the main criminal case. This petition is not about a "judge's ordinary efforts at courtroom administration," *Liteky,* 510 U.S. at 556, 114 S.Ct. 1147, nor about "judicial remarks ... that are critical" of counsel or a party, *id.* at 555, 114 S.Ct. 1147. A judge's investigation of a prosecutor's office under the label of government misconduct as to the grand jury is not just a ruling in the ordinary course. It poses the risk that the line will be crossed "between executive and judicial roles, and between the formulation and evaluation of positions in litigation." *In re United States,* 398 F.3d at 618. This fact means that recusal is not precluded here by the extrajudicial source rule.

Recusal motions are difficult from the point of view of both the district court judge and the reviewing appellate court. The trial judge has a duty not to recuse himself or herself if there is no objective basis for recusal. *See Snyder,* 235 F.3d at 45–46 & n. 1; *Blizard v. Frechette,* 601 F.2d 1217, 1221 (1st Cir.1979); *In re Union Leader Corp.,* 292 F.2d 381, 391 (1st Cir.1961). A district judge, faced with a recusal motion, is also being asked to step outside herself or himself and take the objective view of an informed outsider. That is difficult for even a saint to do. Moreover, the trial judge has been in the heat of the proceedings, and objectivity, though sought, may be elusive. That is especially so when the proponent of the motion to recuse argues that there is actual bias on the judge's part.

For our part, an appellate court has no wish to encourage strategic moves by a disgruntled party to remove a judge whose rulings the party dislikes. "[T]he disqualification decision must reflect *not only* the need to secure public confidence through proceedings that appear impartial, *but also* the need to prevent parties from too easily obtaining the disqualification of a judge, thereby potentially manipulating the system for strategic reasons, perhaps to obtain a judge more to their liking." *In re Allied–Signal Inc.,* 891 F.2d 967, 970 (1st Cir.1989).

---

20. It is sometimes said, as a corollary of the principle that a judge's decisions on matters before him or her ordinarily cannot result in recusal, that the party must show an "extrajudicial" source for the apparent bias. *See Liteky,* 510 U.S. at 551, 114 S.Ct. 1147 ("[M]any opinions have [suggested] that 'extrajudicial source' is the only basis for establishing disqualifying bias or prejudice."). There is no such absolute rule: an "extrajudicial source" is not the exclusive basis for establishing disqualifying bias or prejudice. *See id.; see also id.* at 554–55, 114 S.Ct. 1147.

68

The statutory standard we apply here, that there is no reasonable basis to question the impartiality of the judge, has high aspirations. The standard does not depend on a showing of actual bias. It requires instead that there be no reasonable question, in any informed person's mind, as to the impartiality of the judge. Under § 455(a), "what matters is not the reality of bias or prejudice but its appearance," and "[q]uite simply and quite universally, recusal [is] required whenever 'impartiality might reasonably be questioned.'" *Liteky*, 510 U.S. at 548, 114 S.Ct. 1147 (quoting 28 U.S.C. § 455(a)); *see also In re Boston's Children First*, 244 F.3d at 167; *In re United States*, 158 F.3d at 31. "[J]ustice must satisfy the appearance of justice." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 864, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988) (internal quotation marks omitted) (quoting *In re Murchison*, 349 U.S. at 136, 75 S.Ct. 623). "The very purpose of § 455(a) is to promote confidence in the judiciary by avoiding even the appearance of impropriety whenever possible." *Id.* at 865, 108 S.Ct. 2194.

■■■ The appellate court is more removed and hence more objective. We are struck by the district court's insistence, in the course of denying the recusal motion, not only on continuing an investigation that had already yielded results not showing any government wrongdoing, but also on resuscitating leak claims that had been dormant for over a year. We are struck by its orders that the government disclose yet further information as to the return of the indictment by the third grand jury, even when the government had already provided explanations, despite there being little basis in the law or in fact for the inquiry. Of particular concern is the deci-

sion by the district court to delay the trial, apparently in order to reserve the power to dismiss the indictment, when there was never any realistic basis to consider dismissal of the indictment as a remedy.

We conclude that the cumulative effect is to establish a reasonable basis for questioning the impartiality of the district court judge. In light of that conclusion, we order recusal of the present district judge and that the case be assigned on remand to a different judge.[21] We do so with no criticism of the judge, who was faced with a series of difficult issues. We also order that on remand the case be promptly set for trial. And, in the absence of any new evidence of government misconduct under Rule 6, we order termination of the present investigation. *See In re United States*, 398 F.3d at 619–20.

## VI.

### *Conclusion*

The petition for mandamus is *granted*. The district judge is ordered to recuse himself. On remand, this criminal case is promptly to be reassigned to a different judge and set for trial. The investigation into government misconduct in the grand jury proceedings shall, in the absence of any new evidence of misconduct, be terminated. So ordered.

---

21. The government does not invoke our power under 28 U.S.C. § 2106 to order that the case be reassigned on remand to another judge, and no party has briefed the issue. We do not address the point.