# In the
# United States Court of Appeals
## For the Seventh Circuit

---

No. 05-1114

In the Matter of:

UNITED STATES OF AMERICA,

*Petitioner.*

---

Petition for a Writ of Mandamus
to the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 93 GJ 51—**James F. Holderman**, *Judge.*

---

SUBMITTED FEBRUARY 2, 2005—DECIDED FEBRUARY 15, 2005

---

Before EASTERBROOK, MANION, and KANNE, *Circuit Judges.*

PER CURIAM. Unnecessary medical procedures performed at Edgewater Hospital in order to obtain payments from insurers (including the federal government's health-care programs) led to criminal prosecutions for fraud. Peter Rogan, a principal at one of Edgewater's management companies, was not among the criminal defendants, but the United States filed a civil suit against him seeking compensatory damages and penalties under the False Claims Act. In this capacity Rogan obtained materials that had been gathered by the grand jury that issued the indictments. The estate of Albert Okoro, who had died during one of Edgewater's unnecessary procedures, also sought grand jury materials for use in civil litigation against Rogan and others. Persuaded that Okoro's estate should have some

(though not all) of the materials already in Rogan's posses-
sion, the United States Attorney for the Northern District
of Illinois applied to the district court for an order under
Fed. R. Crim. P. 6(e)(3)(E)(i) permitting their release. The
application, made *ex parte* as Rule 6(e)(3)(F) permits, was
presented to Chief Judge Kocoras and granted. He autho-
rized the United States to give Okoro's estate whatever
grand jury materials the prosecutor saw fit to release.

After learning that Okoro's estate had acquired grand
jury materials for use in the pending suit, Rogan protested
to Chief Judge Kocoras. This led to his recusal—for his
son is a partner at Winston & Strawn, which represents
Rogan. See 28 U.S.C. §455(b)(5)(ii), (iii). Under local prac-
tice, Rogan's motion was transferred to Judge Holderman
because he is next in line to become chief judge. The United
States Attorney acknowledged that the grant of discretion
to determine which materials to hand over was not best
practice, and it volunteered to retrieve the materials so that
any dispute about the extent of the estate's access could be
decided with Rogan's participation. Judge Holderman
vacated Chief Judge Kocoras's order in light of this under-
taking. At that point, however, consideration of the estate's
request for information came to a halt. Judge Holderman
decided not to address it until he learned why the United
States had made the *ex parte* request to Chief Judge
Kocoras. He deemed *ex parte* action, and the grant of
discretion to an Assistant United States Attorney, so
irregular that he threatened to hold the Assistant in
criminal contempt of court, and he demanded to know who
within the United States Attorney's Office participated in
the decision to file such a request and why they had
approved it. Meanwhile the state litigation went to trial,
and Okoro's estate was handicapped by the lack of access to
materials that were in Rogan's possession. The estate
recovered from other defendants and apparently has
decided not to pursue the matter further, but the district

judge's investigation of the prosecutor's office continues.

The United States now asks us to issue a writ of mandamus to accomplish Judge Holderman's recusal, on the ground that his impartiality reasonably may be questioned by objective and informed observers. See 28 U.S.C. §455(a); *Liteky v. United States*, 510 U.S. 540 (1994); *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988). Mandamus is the right—indeed, we have held, see *United States v. Boyd*, 208 F.3d 638, 645 (7th Cir. 2000); *United States v. Balistrieri*, 779 F.2d 1191, 1204-05 (7th Cir. 1985), the only—means to this end. Yet many of the petition's arguments deal more with what is being done (an investigation of decision-making within the U.S. Attorney's Office) than with which judge is doing the investigation. One form of relief fairly comprised within the petition's scope is a halt to the inquest. We conclude that the inquiry is inappropriate and must cease; this makes it unnecessary to decide whether someone other than Judge Holderman is the right person to preside.

When Rogan's protest sparked Chief Judge Kocoras's recusal and landed the matter in Judge Holderman's lap, he concluded (as his response in this court states): "It was hard for me to believe that Chief Judge Kocoras would sign such an erroneous order unless he were misled." Judge Holderman thought that the United States had "cited inapplicable subsections of Rule 6(e)" and failed to alert Chief Judge Kocoras to decisions of this circuit that disparaged *ex parte* applications under Rule 6(e). To quote again from Judge Holderman's response: "I wondered why . . . better procedures had not been employed? Was it by neglect or design? That was the key question that I needed to have answered."

The judge threatened to have Assistant United States Attorney Jacqueline Stern, who had signed the application, prosecuted for criminal contempt of court. Instead of leading to the information the judge sought, however, the

threat caused Stern to retain a lawyer. The judge then asked that Stern be given immunity from prosecution in order to induce her cooperation. It is not clear that the Executive Branch *can* foreclose a charge of criminal contempt, see *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 799 (1987), but at all events immunity is not bestowed lightly (or quickly). Thus the judge asked for information from other attorneys in the Office, only to find that they were less than forthcoming given the threat to prosecute whoever turned out to be responsible; and when the Office did not provide as much information (and as fast) as the judge sought, he insisted that everyone, right up to the United States Attorney, be investigated by the Department of Justice's Office of Professional Responsibility, which the judge wanted to report back to him with its findings.

The fundamental problem with this inquiry is that the United States Attorney is not answerable to a judge for the deliberations among his staff. The intra-office conversations and memoranda that the judge wants to see are covered by multiple privileges. See, e.g., *United States v. Zingsheim*, 384 F.3d 867 (7th Cir. 2004), which holds that federal judges may not insist that prosecutors reveal deliberative or pre-decisional materials. A federal court must evaluate lawyers' final submissions—that is, must review outputs rather than inputs. How the United States reaches its litigating positions, who said what to whom within the prosecutor's office, and so on, are for the Attorney General and the President to evaluate. The Judicial Branch is limited to assessing counsel's public deeds.

Judges often are tempted to seek a larger role in the conduct of litigants that appear frequently before them. See also, e.g., *In re United States*, 345 F.3d 450 (7th Cir. 2003). Temptation may be especially strong for a judge who spent many years as a prosecutor before donning the robe. (Judge Holderman served for six years as an Assistant United

States Attorney in the Northern District of Illinois.) But temptation must be resisted in order to maintain separation between executive and judicial roles, and between the formulation and evaluation of positions in litigation. In the rare situations when a prima facie case of criminal contempt has been made out, and the contempt is not committed in the judge's presence (and thus amenable to summary disposition), the judge must turn the matter over to a prosecutor rather than assume an inquisitorial role inappropriate to the Judicial Branch.

None of the papers that the United States tendered to Chief Judge Kocoras is objectively frivolous. There is accordingly no basis for civil sanctions, let alone criminal proceedings, against any member of the United States Attorney's Office. The United States did not release any grand jury material without judicial approval; it sought and obtained authorization before acting. Nor did it hide from Chief Judge Kocoras the fact that Rogan had not been notified. To the contrary, the application alerted the Chief Judge to its *ex parte* nature. If that was a problem, the Chief Judge could have denied the application and ordered service on Rogan's lawyers. Likewise the application showed that the United States sought discretion to decide which materials to hand over, and the Chief Judge bestowed that power on the prosecutor's office. Perhaps he should not have done so, but it cannot be thought a form of criminal contempt to ask the court and then proceed with its approval.

When making *ex parte* applications a litigant must alert the tribunal to authority, known to it, that may be inconsistent with its legal position, for there is no adversary to do that job. Judge Holderman thought that the United States Attorney should have called Chief Judge Kocoras's attention to *Illinois v. Sarbaugh*, 552 F.2d 768 (7th Cir. 1977); *United States v. Miller Brewing Co.*, 687 F.2d 1079 (7th Cir. 1982); *Illinois v. F.E. Moran, Inc.*, 740 F.2d 533

(7th Cir. 1984); *In re Moore*, 776 F.2d 136 (7th Cir. 1985); and *In re Special March 1981 Grand Jury*, 753 F.2d 575 (7th Cir. 1985) (*Almond Pharmacy*). Judge Holderman reads these decisions as precluding *ex parte* requests to authorize the release of grand jury materials. We do not understand them so. Two predate the 1983 amendments to Rule 6(e), which explicitly authorize *ex parte* proceedings when the United States is the petitioner. (*Ex parte* consideration preserves grand jury secrecy while nondisclosure remains a possibility.) *F.E. Moran* likewise does not mention the amendment, because the applications for grand jury materials had been made before November 1, 1983, when it took effect. *Moore* recognizes that changes to Rule 6(e) were made in 1983 but does not remark the new authority to proceed *ex parte*; that subject had not been broached, for the very good reason that the dispute in *Moore* concerned venue rather than procedures to be used in reaching a decision. Only *Almond Pharmacy* mentions the amendment to Rule 6(e)(3)(F)— and even then not to apply it, because the applications had been made in September and October 1983, while the old language still governed.

None of these decisions establishes that the 1983 amendment means anything other than what it says. Under Rule 6(e)(3)(F) as it reads today, the United States is entitled to file an application *ex parte*, after which the judge must decide whether to order an interested private party to be notified. It is not hard to imagine circumstances in which lack of notice would abuse the district judge's discretion: for example, when the United States seeks to favor its own interests by authorizing itself to use grand jury material in a civil suit, the judge would be well advised to let the civil defendant have an opportunity to oppose the motion. But when the United States seeks permission to give the materials to a private litigant, there is less reason to fear a one-sided presentation; after all, the prosecutor has an ongoing interest in protecting grand jury materials from

unwarranted disclosure to private parties, for such disclosures could make it harder to secure cooperation in future criminal investigations. See *In re Biaggi*, 478 F.2d 489, 491-92 (2d Cir. 1973) (Friendly, J.). A proposal to allow one private litigant access to grand jury materials already in the possession of its adversary is not the sort of thing that calls the prosecutor's *bona fides* into question; it is understandable that Chief Judge Kocoras granted the application. At all events, as we have stressed, when the United States Attorney's Office makes a mistake and seeks inappropriate relief, the judiciary's proper course is to deny the motion, not to threaten criminal prosecution or seek privileged pre-decisional materials. Our legal system does not contemplate an inquisitorial role for federal judges.

Tempers have flared on both sides; Judge Holderman tells us (in his response to the petition) that he has said some things that he regrets, and the same should hold true for the United States Attorney, whose petition in this court levels some overwrought charges. We think it likely that everyone has acted from good intentions, but that a strong belief in one's own position has led to the unsound inference that anyone who disagrees must be acting in bad faith. A swift end to this contretemps will allow calmer reflection and, we trust, a restoration of the cordial and mutually respectful relations between bench and prosecutor that are vital to the administration of justice.

The petition for a writ of mandamus is granted, and the district court is directed to close its investigation into the proceedings that occurred before Chief Judge Kocoras in December 2003. The Office of Professional Responsibility is free to proceed as it chooses, but it need not investigate at the behest of the Judicial Branch—nor are its findings (if it conducts an investigation voluntarily) to be reported to the Judicial Branch. This is a matter for the Executive Branch to handle internally using its own judgment. Because we have halted the district court's inquest, we need not discuss

any of the other issues on which the U.S. Attorney, the civil litigants, and the district judge have exchanged opposing views.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—2-15-04