Filed 2/2/22  Current or Former Employees of PG&E v. Superior Court CA3

# NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| CURRENT OR FORMER EMPLOYEES OF PACIFIC GAS & ELECTRIC COMPANY, <br><br> Petitioners, <br><br> v. <br><br> THE SUPERIOR COURT OF BUTTE COUNTY, <br><br> Respondent; <br><br> THE PEOPLE et al., <br><br> Real Parties in Interest. | C092045 <br><br> (Super. Ct. No. 20CF01422) |

Petitioners are 22 current or former employees of Pacific Gas & Electric Company (PG&E) who seek to have their names redacted from grand jury transcripts of the Camp Fire investigation when released to the public.  The Camp Fire, caused by a failure of PG&E's transmission equipment, devastated Butte County, killing 84 people and

1

destroying the town of Paradise.  The grand jury investigation led to the indictment of PG&E but none of its employees.  The superior court granted a motion to redact the names of local PG&E employees mentioned in the transcripts, finding that "evidence in the record of threats and potential and actual violence against [PG&E's] employees, combined with the devastating impact of the Camp Fire on the Butte County community, establishes a substantial probability that local employees will be at risk if their names are publicized in connection with the grand jury proceedings."  The court did not find "such a substantial probability as to employees outside this area."  Petitioners are out-of-area PG&E employees whose names are mentioned in the transcripts.

We will deny the petition and affirm the superior court's order.

## FACTUAL AND PROCEDURAL BACKGROUND

Early on the morning of November 8, 2018, the Camp Fire ignited in Butte County.  Within hours, 84 people had died in the fire and the town of Paradise was destroyed.

On March 17, 2020, the grand jury in Butte County indicted PG&E alleging 84 counts of involuntary manslaughter and one count of unlawfully causing a fire.[1]  On the same day, PG&E agreed to plead guilty to the indictment.

On May 28, 2020, PG&E submitted a memorandum to the superior court urging redaction of the names of PG&E employees mentioned in the grand jury transcripts. PG&E represented that the district attorney's office agreed that there was a risk to the safety of PG&E employees and redactions were appropriate.  PG&E submitted a Power Point presentation cataloging threats against PG&E employees in recent years, an Excel workbook of such threats and violence from September 2010 through March 2020, and an excerpt of the grand jury transcripts with proposed redactions.

---

[1]     On June 15, 2020, the superior court ordered sealed the last two pages of the indictment listing the names of grand jury witnesses.

2

The Power Point presentation consisted of 22 communications via e-mail, Twitter, text, Facebook and webpages from November 2018 to March 19, 2020, making threats and expressing hostile and violent sentiments towards PG&E and its employees.

For example, the first e-mail on November 13, 2018, to former PG&E chief executive officer Geisha Williams read: "I was relieved earlier this year when PG&E was finally allowed to turn off electricity when dangerous weather conditions were going to occur. This is a common sense idea. Many of us were warned by PG&E on Nov 7 2018 that this was imminent, yet it was never shut down. Conditions obviously demanded this, yet your company took NO ACTION. In light of this, I would like to know the name(s) of the person(s) responsible for NOT turning off electricity on the morning of Nov 8, 2017, in Butte county. This person(s) is/are responsible for the MURDER of over 200 people and the destruction of over 7000 (SEVEN THOUSAND!!!!) homes. This BLATANT DISREGARD for public safety rises to the level of criminal activity. I demand that the people that made this decision to [*sic*] be held responsible. I'm sure PG&E will be [*sic*] pay financially for damages, but this will do nothing for all of the wonderful people you murdered. Please reply with the names of those responsible so they can be held personally responsible, and true reconciliation can begin."

The Excel workbook exhibit collected more than 100 incidents of threats, harassment and assaults directed at PG&E employees throughout Northern California. This compilation included incidents where the Camp Fire was specifically mentioned: (1) a November 25, 2018 hostile letter to Williams in San Francisco about the Camp Fire; (2) a January 18, 2019 e-mail from a customer to PG&E's contact center in San Leandro blaming PG&E for starting the fire in Paradise and "hoping that we all burn to the ground"; and (3) a January 30, 2019 threat posted on Facebook in San Francisco stating that every PG&E building should be burned down and "PG&E employees need to go to prison for all of the people that died in the Paradise fire."

3

On May 22, 2020, the trial court ordered that the grand jury transcripts be maintained under seal until June 16, 2020, to provided PG&E and the People sufficient time to review the transcripts and propose redactions.

On May 29, 2020, PG&E applied for an order under California Rules of Court, rule 2.551 to seal the Power Point presentation and Excel spreadsheet.[2] The trial court signed the order that day.

On June 1, 2020, the People, represented by the Butte County District Attorney, opposed PG&E's sealing submission, contending that PG&E could not meet the requirements of rule 2.550 for sealing records and requesting that only the names of PG&E employees who lived and worked in the Butte County area be redacted.

In reply, PG&E argued that the parties agreed that threats and violence against PG&E employees were real and PG&E employees had been attacked throughout Northern California. PG&E maintained there was no basis to conclude the risk was limited to Butte County.

On June 1, 2020, former and current PG&E employees filed a motion under rules 2.550 and 2.551 to redact their names and personal identifying information from the grand jury transcripts.[3]

Movants stated that the PG&E employees mentioned in the transcripts fell into eight categories. The first category consisted of employees who worked at or had responsibility for PG&E's Table Mountain district close to the time of the Camp Fire or for recent inspections. The equipment failure that caused the Camp Fire was located in

---

[2] All undesignated references to rules are to the California Rules of Court.

[3] The superior court permitted nonparty PG&E employees to submit a brief and supporting papers by sending the papers electronically to PG&E's counsel, who forwarded them to the court and the district attorney, after which counsel for the employees filed the papers with the court.

4

PG&E's Table Mountain district.  The employees in this category "had direct responsibilities related to inspection, maintenance, or engineering of power lines in Butte County, specifically transmission towers on the Caribou-Palermo line where the fire was determined to have started."  The equipment that failed and caused the fire was a "C hook," a component of a transmission tower on the Caribou-Palermo line in the Table Mountain district.  Movants argued that employees who worked at Table Mountain had a higher risk that a person reviewing the grand jury transcript would incorrectly assume these employees were responsible for the Camp Fire, even though they were not charged with criminal conduct.

The second category consisted of employees who had a hands-on role in the policies, planning, asset management, or engineering for PG&E's transmission structure.  Movants argued that "[t]he public may view these employees as ultimately responsible for the policies and decisions (such as not replacing transmission towers in the Feather River canyon) that potentially contributed to the Camp Fire, despite the fact that none of them had any criminal liability."  Movants further argued that "[w]hile it is true that not all members of this group are local to Butte County, this should not matter.  Threats are not local -- the persons making the threats do not announce their location, and anyone can be threatened from anywhere.  Violence is not local.  It has been widespread, and with the internet it is easy to track anyone down."[4]

---

[4]    The other six categories were PG&E employees:  (1) designated as most knowledgeable about a policy or engineering issue; (2) knowledgeable about the 2010 San Bruno gas line explosion; (3) knowledgeable about Table Mountain inspections between the 1980s and 2005; (4) who travel to different areas of the state and may have done work on the Caribou-Palermo power line unrelated to the fire and its cause; (5) who may have experienced equipment or hook failure on other power lines and made analyses or safety recommendations prior to the fire; and (6) who assisted PG&E and CalFire in the fire investigation.

The motion was supported by declarations from three attorneys representing certain current and former PG&E employees who were witnesses or potential witnesses in the Camp Fire investigation.

Attorney Britt Evangelist declared that she represented a number of current or former PG&E employees in low- to mid-supervisory roles in the company, who were witnesses or potential witnesses in the Camp Fire investigation. Evangelist grouped her clients into two categories that corresponded to the first two of the eight categories described in the motion. She described seven clients in the first category, all of whom lived in or near the area affected by the Camp Fire. Evangelist described three clients in the second category. The geographic location of these employees was not included in their descriptions.

Evangelist declared that the majority of her clients in the first category "who live and work in the Table Mountain and/or Camp Fire region have either experienced harassment of some sort firsthand or have knowledge of close co-workers or family members who have." According to Evangelist, these PG&E employees had taken steps to hide that they work for PG&E, only telling friends and family and not wearing their PG&E uniforms in restaurants and public places. One client did not use his company vehicle for a year after the fire to avoid harassment. Evangelist set forth specific examples of harassment experienced by these local PG&E employees including: cars slowing down for the occupants to yell insults and obscenities; a confrontation with the driver of a pickup truck where the client feared for his safety; neighbors and others making obscene gestures at her clients when they drove PG&E vehicles; a PG&E truck being egged in front of an employee's home; signs in stores or restaurants that PG&E employees were not welcome; construction or other work requiring a police or security escort on the property of certain customers; and the driver of a vehicle coming on to a PG&E construction site, pointing a gun out the window, firing and driving off.

Evangelist declared that her clients in the second category "have not experienced harassment firsthand because of their employment with PG&E," but "are aware of this phenomenon via media reports and company bulletins" and have "expressed a genuine concern that they and their family could be targeted for harassment in the future should the transcripts containing their names be released."

Attorney Miranda Kane declared that her firm represented 26 current or former PG&E employees in connection with the Camp Fire grand jury investigation. The majority of her clients had nonsupervisorial positions at PG&E's Table Mountain substation or supported it as part of their jobs and were responsible for inspection, maintenance and repair of PG&E's transmission lines, including one client who conducted the most recent aerial inspection of the Caribou-Palermo line where the fire started. Most of Kane's clients lived in the communities they served. Since the Camp Fire, many of her clients had experienced harassment and mistreatment or heard of those who had, due to the fact that they work for PG&E. Because they wear PG&E uniforms and drive company trucks, Kane's clients had received obscene or threatening gestures while doing their jobs or had been approached in public places and verbally abused.

Attorney Alexander Gourse declared that his firm represented 10 current or retired PG&E employees designated as witnesses by the district attorney. Four of the firm's clients had testified to "hook and/or suspension plate failures" similar to the hardware failure that led to the Camp Fire. Three clients were subject-matter experts who conducted tests of such hardware failures, two of which also worked with PG&E and CalFire to determine problems with PG&E's tower and line infrastructure after the Camp Fire. One was a longtime PG&E employee who was copied on group e-mails but did not work or have knowledge of the issue described in the e-mails. Two clients worked on the Caribou-Palermo line between 2012 and 2016 but did not work at the location or on the hardware that failed and caused the Camp Fire. One client worked in PG&E's finance department forecasting expenditures and comparing budget allocations, but was not

7

involved in prioritizing expenditures related to maintenance or inspection of infrastructure.

Gourse stated that one of his PG&E employee clients had been subject to harassment and threats from members of the public due to affiliation with PG&E. This client reported an incident in Napa, California associated with a public safety power shutoff, where a customer held a PG&E employee at gunpoint. A customer had also called Gourse's client an "SOB" and asked how he would like it if his house burned down in the middle of the night.

On June 1, 2020, the superior court conducted a hearing with counsel for the People and PG&E regarding PG&E's redaction request. At the outset, the court indicated that its tentative ruling was to grant the request as to the names of employees who live and work in the Butte County area and deny it as to other employees. After argument, the court confirmed the tentative ruling, observing that "as to the non local [*sic*] PG&E employees, a substantial probability of threats or violence, in the Court's view, has not been shown. The record shows that a significant majority of threats or acts of violence directed at non local [*sic*] employees had nothing to do with the 2018 Camp Fire. Also, many of those threats or violence were directed at individuals whose names are already known to the public."

On June 3, 2020, the superior court issued a written order granting in part and denying in part PG&E's motion to redact the names of employees mentioned in the grand jury transcripts. The court made findings required by rule 2.550 to seal records.[5] The

---

[5] Rule 2.550(d) provides:
"The court may order that a record be filed under seal only if it expressly finds facts that establish:
"(1) There exists an overriding interest that overcomes the right of public access to the record;
"(2) The overriding interest supports sealing the record;

8

court found: (1) "the safety of witnesses can be an 'overriding interest' that may justify sealing or redacting otherwise public records, and . . . that there is an overriding interest in preventing threats of violence that are so extreme as to threaten the safety of the recipient"; (2) "the safety of witnesses supports certain redactions in this case"; (3) "evidence in the record of threats and potential and actual violence against the defendant's employees, combined with the devastating impact of the Camp Fire on the Butte County community, establishes a substantial probability that local employees will be at risk if their names are publicized in connection with grand jury proceedings"; (4) "such a substantial probability [was not established] as to employees outside this area"; (5) "limiting the redactions to only the names of local employees at greatest risk of threats and violence is narrowly tailored"; and (6) "redacting only the names of local employees is the least restrictive means available to protect these employees from threats and violence."

The superior court ordered that the names of PG&E employees who testified or were mentioned in the grand jury transcripts residing in Butte, Yuba, Glenn, Tehama, Sutter, and Plumas counties be redacted and replaced with the words "Witness" or "Employee" and an agreed-upon number.

On June 5, 2020, petitioners attempted to file an ex parte application for leave to intervene, and for the court to vacate the sealing order and issue a modified order redacting all employee's names, or, in the alternative, to stay disclosure pending appellate review. In a supporting declaration, counsel for petitioners stated his understanding that the grand jury transcripts were scheduled to be publicly disclosed on June 16, 2020. The

---

"(3) A substantial probability exists that the overriding interest will be prejudiced if the record is not sealed;
    "(4) The proposed sealing is narrowly tailored; and
    "(5) No less restrictive means exist to achieve the overriding interest."
    The rule is derived from *NBC Subsidiary (KNBC-TV), Inc. v. Superior Court* (1999) 20 Cal.4th 1178, 1217-1218 (*NBC Subsidiary*).

court refused to accept the ex parte application because petitioners were not parties. PG&E declined to file the application on petitioners' behalf.

On June 9, 2020, petitioners filed in this court an application to file under seal a list of their names and a certificate of interested parties, along with redacted versions of their petition for writ of mandate and request for an emergency stay of the June 16, 2020 release of the grand jury transcripts.

On June 15, 2020, we issued an order granting petitioners' application to file these documents under seal and struck the redacted documents filed on June 9, 2020. Petitioners thereafter filed unredacted versions of the documents under seal, as well as redacted versions in the public file. We also issued a stay of public release of the grand jury transcripts pending further order of this court. We requested preliminary opposition from the district attorney on behalf of the People, gave leave to the Attorney General to file a separate preliminary response, and extended time for PG&E to file a preliminary response.

On July 29, 2020, after receiving preliminary briefing from the People, petitioners and PG&E, as well as allowing amici curiae TEGNA Inc. and Dow Jones & Company, Inc. to file a letter brief in support of the People, we issued an order to show cause why the relief sought by petitioners should not be granted. The People and PG&E filed written returns to the order and petitioners replied.

## DISCUSSION

### *Standard of Review*

Petitioners contend that the standard of review of the superior court's sealing order is de novo while the People advocate for an abuse of discretion standard. These dueling positions reflect a split of authority.

In *In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, the court held the correct standard of review of an order under rule 2.550 (formerly rule 243.1) is that "the factual determinations made by the trial court must be upheld if they have the

10

support of substantial evidence, and [the] ultimate decision to unseal must be sustained unless we decide that the trial court abused the discretion granted it" by the rule. (*Providian, supra*, at p. 299.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' [Citation.]" (*Ibid.*) "It is also clear that if a trial court exercises its discretion and orders a record sealed, that decision is made after, and in light of, the factors enumerated" in rule 2.550(d). (*Providian, supra*, at p. 300.)

In *People v. Jackson* (2005) 128 Cal.App.4th 1009 (*Jackson*), the court expressed doubt that *Providian*'s abuse of discretion standard for an order to unseal documents regarding trade secrets was appropriate for documents in the prosecution of the defendant for child molestation. (*Id*. at p. 1020.) The court concluded that "cases implicating First Amendment rights are subject to independent review," in which the appellate court exercises its independent judgment after "an independent examination of the whole record" to determine whether the facts satisfy the rule of law. (*Id.* at p. 1021.) Further, the *Jackson* court said that, while independent judgment is not the same as de novo review, where the trial court did not take testimony and determine the credibility of witnesses, the appellate court reviews the same record as the trial court, and "[i]n these circumstances, independent review is the equivalent of de novo review . . . ." (*Ibid.*)

In *Oiye v. Fox* (2012) 211 Cal.App.4th 1036, the court rejected an attempt to distinguish the independent review standard in *Jackson* as applicable only where First Amendment rights are involved. (*Id.* at p. 1067.) The court said that the decision in *Jackson* to conduct independent review was "based on the state of the record, where no declarations were presented regarding the propriety of the sealing order, and not on the First Amendment." (*Ibid.*)

In *Overstock.com, Inc. v. Goldman Sachs Group, Inc.* (2014) 231 Cal.App.4th 471 (*Overstock*), the court disagreed with *Oiye*'s analysis, holding that it was apparent the court in *Jackson* employed independent review "because the sealed records rules are grounded in the First Amendment right of access." (*Id*. at pp. 491-492.) The court said,

11

however, it "need not . . . resolve whether *Providian* or *Jackson* most accurately sets forth the standard of review for orders sealing court records," because in an order *denying* sealing "courts have consistently employed the approach articulated in *Providian*." (*Id.* at p. 492.)

Here, as in *Overstock*, the petition for writ of mandate seeks to reverse the portion of the superior court's order denying sealing. (*Overstock, supra*, 231 Cal.App.4th at p. 492.) Therefore, "we review the ultimately discretionary decision to deny sealing by inquiring whether substantial evidence supports the trial court's express or implied findings that the requirements for sealing are not met." (*Ibid.*)

*Standing*

The People preliminarily argue that petitioners lack standing because they are not " 'aggrieved' " by the superior court's order denying the request to redact the names of out-of-area PG&E employees mentioned in the transcripts.

This is the requirement for standing to appeal under Code of Civil Procedure section 902. For purposes of an appeal of a sealing order under section 902, "a party is aggrieved if an order 'injuriously affects[s]' its rights or interests. [Citation.] The injured interest must be 'recognized by law' [citation], and the injury must be 'immediate, pecuniary, and substantial'; it cannot be nominal or be ' " 'a remote consequence of the judgment.' " ' [Citation.]" (*Six4Three, LLC v. Facebook, Inc.* (2020) 49 Cal.App.5th 109, 115; see also *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 737; *Serrano v. Stefan Merli Plastering Co., Inc.* (2008) 162 Cal.App.4th 1014, 1026-1027.) "Section 902 is a remedial statute, so courts construe it liberally, resolving doubts in favor of standing. [Citation.]" (*Six4Three, supra*, at p. 115.)

We think that petitioners satisfy this standard given the evidence in the record that individuals identified as PG&E employees involved in the Camp Fire have been subject to threats and harassment that affects their safety and consequently ability to earn a livelihood. (See *In re Clergy Cases I* (2010) 188 Cal.App.4th 1224, 1233 [in lawsuits

12

alleging sexual abuse claims against Franciscan order of monks, nonparty individual friars had standing to appeal disclosure of their confidential psychological evaluations, which would affect their "personal and pecuniary interests"].)

However, the People's standing argument is inapposite because this case comes to us under our original jurisdiction over a petition for writ of mandate. (Cal. Const., art. VI, § 10; *Palma v. U.S. Industrial Fasteners, Inc.* (1984) 36 Cal.3d 171, 177.) The standard for standing to appeal is not identical to that required for mandamus. (See *In re Veterans' Industries, Inc.* (1970) 8 Cal.App.3d 902, 926-927 [person without sufficient interest for intervention has standing to petition for writ of mandate].) The People do not assert that mandamus is not a proper method for petitioners to challenge the superior court's sealing order.

" 'Code of Civil Procedure section 1086 expresses the controlling statutory requirements for standing for mandate: "The writ must be issued in all cases where there is not a plain, speedy, and adequate remedy, in the ordinary course of law. It must be issued upon the verified petition of *the party beneficially interested.*" ' [Citation.]" (*League of California Cities v. Superior Court* (2015) 241 Cal.App.4th 976, 984-985; *Synergy Project Management, Inc. v. City and County of San Francisco* (2019) 33 Cal.App.5th 21, 30.) Despite the reference to "the party" in the statute, "it is well established that one who petitions for an extraordinary writ need not have been a party to the action below if the one seeking relief demonstrates a beneficial interest in the litigation or is affected by the outcome. [Citation.]" (*League of California Cities, supra*, at p. 985.) " 'The requirement that a petitioner be "beneficially interested" has been generally interpreted to mean that one may obtain the writ only if the person has some special interest to be served or some particular right to be preserved or protected over and above the interest held in common with the public at large.' [Citation.] The petitioner's interest must be direct and substantial. [Citation.] Writ relief is not available if the petitioner gains no direct benefit from the writ's issuance, or suffers no direct detriment

from its denial. [Citation.]" (*Ibid.*)

Petitioners assert that disclosure of their names in the grand jury transcripts will expose them to threats and violence like that experienced by PG&E employees living and working in the area of the Camp Fire. This is sufficient for standing as petitioners assert a direct and substantial interest in protecting their safety that they contend is jeopardized by the superior court's order disclosing their names.

*Sealing Order*

Petitioners contend that "[t]he superior court's decision is based entirely on the incorrect and unsupported premise that because the 22 petitioners live and work beyond the immediate surroundings of Butte County, they do not face the same danger as the locals." We disagree. Substantial evidence supports the superior court's finding that the record of threats and violence against local employees established a substantial probability that disclosure of their names in connection with the Camp Fire would put their safety at risk, but did not establish a substantial probability of this risk to out-of-area employees.

"[Penal Code] section 938.1, subdivision (b), provides that when an indictment is returned, transcripts of testimony taken before the grand jury are to be delivered to the defendant and thereafter filed for public access," subject to a motion to seal.[6] (*McClatchy Newspapers v. Superior Court* (1988) 44 Cal.3d 1162, 1178 (*McClatchy*); see also *Daily Journal Corp. v. Superior Court* (1999) 20 Cal.4th 1117, 1123 (*Daily*

---

[6] Penal Code section 938.1, subdivision (b), provides: "The [grand jury] transcript shall not be open to the public until 10 days after its delivery to the defendant or the defendant's attorney. Thereafter the transcript shall be open to the public unless the court orders otherwise on its own motion or on motion of a party pending a determination as to whether all or part of the transcript should be sealed. If the court determines that there is a reasonable likelihood that making all or any part of the transcript public may prejudice a defendant's right to a fair and impartial trial, that part of the transcript shall be sealed until the defendant's trial has been completed."

14

*Journal*).) "The grand jury proceedings themselves are not open to the public and no public right of access attaches, but once an indictment has been returned [Penal Code] section 938.1, as distinguished from federal procedure, implicitly recognizes the public's qualified right of access to the record of those proceedings." (*Press-Enterprise v. Superior Court* (1994) 22 Cal.App.4th 498, 505, fn. 5.) "Despite the qualified right of access under [Penal Code] section 938.1, '[t]ranscripts of grand jury testimony, unlike testimony before a court in pretrial proceedings, are not public records.' " (*Alvarez v. Superior Court* (2007) 154 Cal.App.4th 642, 654 (*Alvarez*), quoting *Daily Journal, supra*, at p. 1132.)

The Legislature's enactment of Penal Code section 938.1 was not intended "to abrogate traditional concerns regarding disclosure of grand jury testimony." (*Daily Journal, supra*, 20 Cal.4th at p. 1132.) Where, as here, there is to be no trial, "the innocently accused and even witnesses are more vulnerable to a risk of adverse consequences ranging from reputational injury to retaliation." (*Ibid.*; see also *McClatchy, supra*, 44 Cal.3d at p. 1174 [" '[I]f preindictment proceedings were made public . . . witnesses who appeared before the grand jury would be less likely to testify fully and frankly, as they would be open to retribution as well as to inducements' "], quoting *Douglas Oil Co. v. Petrol Stops Northwest* (1979) 441 U.S. 211, 219; *In re Biaggi* (2d Cir. 1973) 478 F.2d 489, 491 [the grand jury secrecy tradition "rests on a number of interests" including "protection of witnesses against reprisal"]; *State of Illinois v. F.E. Moran, Inc.* (7th Cir. 1984) 740 F.2d 533, 540 [purposes served by grand secrecy include "protecting witnesses both from retaliation and from undeserved public obloquy when they are haled before the grand jury and questioned vigorously, maybe even browbeaten, without counsel present" and "the reputations of other persons—persons whom the witness might have mentioned in his grand jury testimony—may be at stake if his grand jury testimony is disclosed"], superseded by rule on another point as recognized by *In re United States* (7th Cir. 2005) 398 F.3d 615, 619.)

Notwithstanding such statement of principle, there is a limited universe of California cases where grand jury transcripts or other court records in a criminal proceeding have been sealed to protect witnesses or the innocent.

In *Jackson* the indictment, search warrant affidavits and other court records were ordered sealed. (*Jackson, supra*, 128 Cal.App.4th at p. 1014.) The Court of Appeal affirmed the orders with the exception of the indictment where it ordered only that the names of unindicted coconspirators be redacted. (*Ibid.*) The court found that sealing the search warrant affidavit was justified to protect minors from the trauma and embarrassment of disclosure of the details of the defendant's alleged crimes. (*Jackson, supra*, at p. 1023; *NBC Subsidiary, supra*, 20 Cal.4th at pp. 1206-1207.) The trial court sealed the grand jury transcripts for the same reason. (*Jackson, supra*, at p. 1027.) In addition, the appellate court noted "the transcript contains a substantial amount of testimony involving criminal allegations against numerous unindicted coconspirators, whose privacy interests also would be violated." (*Ibid.*) The court cited *U.S. v. Smith* (3d Cir. 1985) 776 F.2d 1104, 1114, which it said "affirm[ed] [the] district court's sealing of a bill of particulars that contained the names of unnamed coconspirators, where revealing the names of the coconspirators would have been career threatening." (*Jackson, supra*, at p. 1027.) The court, however, concluded that the indictment could be unsealed with the names of unindicted coconspirators redacted. (*Id.* at p. 1029.) In sum, the court determined that sealing "protects the privacy interests of minors and unindicted purported coconspirators . . . ." (*Id.* at p. 1028.)

Petitioners admit they are not unindicted coconspirators, but argue they deserve similar protection since they were never charged with a crime but might be viewed as wrongdoers unless their names are redacted. However, we do not read *Jackson* to hold that the names of unindicted coconspirators are automatically redacted from grand jury transcripts released under Penal Code section 938.1 to protect their privacy. Unlike the bill of particulars in *U.S. v. Smith* referenced in *Jackson*, grand jury transcripts contain

16

sufficient contextual detail for the public to understand the role of a particular witness or person mentioned by a witness. (See *U.S. v. Kott* (C.D.Cal. 2004) 380 F.Supp.2d 1122, 1125 [distinguishing *U.S. v. Smith* in unsealing indictment, search warrant and application because "a search warrant affidavit will, of necessity, contain detailed explanations of the suspected involvement of all persons named in the affidavit" and "[t]he danger of unfounded character assassination in this context" is not a compelling interest in maintaining secrecy of documents].) In any event, the issue raised by the petition, as well the focus of the evidence presented to the superior court, is whether petitioners' safety was at risk from disclosure of their names in the transcripts.

Seemingly more pertinent to this question are two cases involving the same murders: *People v. Maciel* (2013) 57 Cal.4th 482 (*Maciel*) and *People v. Valdez* (2012) 55 Cal.4th 82 (*Valdez*). In both cases, the defendants contended that the trial court erred in entering orders protecting certain witnesses' identifying information. (*Maciel, supra*, at p. 506; *Valdez, supra*, at p. 101.) The trial court initially ordered redaction of the names of 13 witnesses, as well as the identifying information of a 14th witness, from grand jury transcripts, finding " 'overwhelming good cause' " for these orders "based on the prosecution's showing that the life of anyone who testified would be 'extremely and seriously in danger.' " (*Valdez, supra*, at p. 101.) A subsequent judge ordered that "the previous court-ordered redactions of the grand jury proceeding would remain in effect," based on " 'good cause having been shown as to threats and/or possible danger to the safety of witnesses.' " (*Id.* at p. 102; *Maciel, supra*, at p. 507.) The California Supreme Court rejected defendants' various claims of error regarding nondisclosure of witnesses' identities. (*Valdez, supra*, at pp. 101-128; *Maciel, supra*, at pp. 506-510.)

*Maciel* and *Valdez* involved the shooting deaths of three adults and two children (ages five years and six months) ordered and carried out by members of the Mexican Mafia. (*Maciel, supra*, 57 Cal.4th at pp. 488-489; *Valdez, supra*, 55 Cal.4th at p. 94.) The prosecution presented evidence that members of the Mexican Mafia take a " 'blood

oath' " that " 'death is the only way out' " and those who leave the gang are eventually killed, even 10 or 15 years later. (*Valdez, supra*, at p. 94.) A former member was the principal target and the other victims included his sister and two of her children. (*Valdez, supra*, at p. 94; *Maciel, supra*, at pp. 488-489.) The member who ordered the murder was well aware that the former member was living with his sister and her children and instructed gang members to leave no witnesses. (*Valdez, supra*, at p. 94; *Maciel, supra*, at p. 489.)

Petitioners cite *Maciel* and *Valdez* as support for their contention that protecting witness safety is an overriding interest that supports a sealing order under rule 2.550(d)(1), (2). The People do not dispute "that avoidance of threats and violence can constitute an overriding interest" and have "agreed that there was an increased likelihood of a substantial probability of threats and violence . . . as to current and former PG&E employees working and living in the Butte County area." However, petitioners do not assert that there is any evidence of the extreme and serious danger to a PG&E employee witness anywhere comparable to that which existed for a witness who testified against the Mexican Mafia, a criminal gang whose members were willing to murder an innocent mother and her children. (*Maciel, supra*, 57 Cal.4th at p. 489.) Thus, *Maciel* and *Valdez* furnish no guidance in this instance as to whether the superior court's findings were supported by substantial evidence.[7] We turn to that question now.

It is not a close question. Petitioners' own evidence establishes that the trial court's order was supported by substantial evidence. The declaration petitioners

---

[7]     We note that in *Alvarez* the court concluded that the lesser standard of " 'reasonable likelihood' " of prejudice was the correct standard to apply to unsealing grand jury transcripts under Penal Code section 938.1, not " 'substantial probability.' " (*Alvarez, supra*, 154 Cal.App.4th at p. 645.) However, the " 'reasonable likelihood' " standard is applied to protect the defendant's right to fair trial, which was not an issue in this case given PG&E's guilty plea. (*Id.* at p. 656; Pen. Code, § 938.1, subd. (b).) Petitioners have not suggested that the reasonable likelihood standard applies in this case.

submitted from Evangelist detailed incidents of harassment and threats received by her PG&E employee clients who lived in the community affected by the Camp Fire. Evangelist admitted that her nonlocal PG&E employee clients had not experienced such harassment and threats. Rather, they were concerned because of incidents reported in the media and company bulletins. Kane stated in her declaration that most of her PG&E employee clients were local and many had been subjected to harassment and mistreatment from members of the community due to the fact her clients wore PG&E uniforms and operated PG&E vehicles. Gourse did not identify any of his clients as local. He described two incidents of harassment reported by one client that had occurred since the Camp Fire: one incident involved a PG&E employee being held at gun point that occurred in Napa because of a planned power outage and another incident involved a hostile conversation that may have included an indirect reference to the Camp Fire.

PG&E's exhibit compiling incidents from 2010 through 2020 included only three reports of hostile communications and threats made outside the local community mentioning the Camp Fire. To be sure, of the many incidents since the Camp Fire included in the exhibit, only 13 took place in the counties included in the superior court's order, but at least four of those involved gunshots at or in the vicinity of PG&E vehicles, and one an encounter with a person who threw PG&E gear in the garbage and caused a PG&E crew to evacuate the area and call the police when the person returned with a gun. Incidents of post-Camp Fire harassment and violence, not just threats, against PG&E employees outside the affected area were not connected to the fire.

With respect to PG&E's Power Point of electronically communicated threats, petitioners have not provided any evidence that these messages, some of which involved threats to murder named PG&E employees, led to any other conduct that posed a risk to a PG&E employee. One message was from an individual who claimed to have collected and intended to publish the personal cell phone numbers of PG&E executives. This

customer's ire was provoked by a public safety power outage that personally affected the customer, not the Camp Fire.

In sum, the evidence showed that local PG&E employees had direct experience of harassment and violence from members of the community affected by the fire. PG&E employees who lived outside the area did not have similar experiences. While there were threats regarding the Camp Fire directed at out-of-area employees, they were few in number, and incidents of harassment and violence against PG&E employees outside the area were not connected to the Camp Fire. The evidence in the record supports the conclusion that it is the proximity of local PG&E employees to members of the community affected by the Camp Fire that creates the safety risk.

We conclude there was substantial evidence supporting the superior court's finding of a substantial probability of risk to the safety of local PG&E employees if their names were disclosed in the Camp Fire grand jury transcripts but not for out-of-area employees. Therefore, the trial court did not abuse its discretion in framing the sealing order in this manner.[8] (*Overstock, supra*, 231 Cal.App.4th at p. 492.)

---

[8] Since we have determined that the evidence in the record submitted by PG&E and petitioners, and considered by the superior court, supported the sealing order, we reject PG&E's contention that "procedural errors," e.g., the exclusion of petitioners' counsel from the hearing on the sealing order and the court's refusal to accept petitioners' posthearing papers, is another basis on which to reverse the court's order.

20

## DISPOSITION

The petition for writ of mandate is denied and the order to show cause is discharged.  The stay issued by this court on June 15, 2020, is vacated upon issuance of the remittitur.  The parties shall bear their own costs in this proceeding.  (Cal. Rules of Court, rule 8.493(a)(1)(B).)


          /s/
RAYE, P.J.


We concur:


     /s/
RENNER, J.


     /s/
KRAUSE, J.

21